Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

1

---

## Page 1

1    IN THE UNITED STATES DISTRICT COURT FOR THE
         NORTHERN DISTRICT OF MISSISSIPPI
2              OXFORD DIVISION

3
JAMES LEE SONS, individually and
4  on behalf of the wrongful death
   beneficiaries of JAMES ALLEN
5  PARKS SONS, deceased        PLAINTIFFS

6  VS.       NO. 3:16-CV-181-MPM-RP

7  BENTON COUNTY, MISSISSIPPI, ET AL    DEFENDANTS

8

9
10  *********************************************************
11    VIDEOTAPED DEPOSITION OF A. A. "Arnie" McMULLEN
12  *********************************************************
13

14

15      TAKEN AT THE INSTANCE OF THE PLAINTIFF
      IN THE LAW OFFICES OF FARESE, FARESE & FARESE, P.A.
16      122 CHURCH STREET, ASHLAND, MISSISSIPPI
        ON DECEMBER 7, 2016, BEGINNING AT 10:22 A.M.

17

18

19        APPEARANCES NOTED HEREIN

20

21

22  Reported by: REGINA D. RUSSELL, RPR, CCR 1110

23  _____

24        ADVANCED COURT REPORTING
          P.O. BOX 761
25        TUPELO, MS 38802-0761
          (662) 690-1500

---

## Page 2

1
   APPEARANCES:
2
   For the Plaintiffs:    PHILIP A. STROUD, ESQUIRE
3                         The Stroud Law Firm, P.C.
                          5779 Getwell Road, Suite C-1
4                         Southaven, MS  38672
                          (662) 536-5656
5
6                         JAMES B. LEES, JR., ESQUIRE
                          Hunt & Lees
7                         Post Office Box 2506
                          Charleston, WV  25329-2506
8                         (304) 344-9651
9
10  For the Defendants:   S. RAY HILL, III, ESQUIRE
                          Clayton O'Donnell, PLLC
11                        Post Office Drawer 676
                          Oxford, MS  38655
12                        (662) 234-0900
13
   Also Present:      JOE BATTS, Corporate
14                    Representative for Benton
                      County, MS
15
                      ROB SAWYER, VIDEOGRAPHER
16
17
18
19
20
21
22
23
24
25

---

## Page 3

TABLE OF CONTENTS

WITNESS                                      PAGE
A. A. "ARNIE" McMULLEN
    Examination by Mr. Stroud..............    4
    Examination by Mr. Hill................   69

EXHIBITS
1   Policies and Procedures for Jail
        Facility.........................   33

2   Letter from Philip Stroud to A. A.
        McMullen, dated 9-22-15..........   67

---

## Page 4

1        THE VIDEOGRAPHER:  This is the video
2  deposition of Sheriff A. A. "Arnie" McMullen, taken
3  by the Plaintiff in the matter of James Allen Parks
4  Sons, deceased, versus Benton County, Mississippi, et
5  al, U.S. District Court for the Northern District of
6  Mississippi, Oxford Division, Docket
7  3:16-CV-181-MPM-RP.  This deposition is being held at
8  Farese, Farese & Farese, 122 Church Street, Ashland,
9  Mississippi, on December 7th, 2016.  I'm Rob Sawyer,
10  Law Media Productions.  The court reporter is Regina
11  Russell of Advanced Court Reporting.  We're on the
12  record at 10:24 a.m.  Counsel, would you identify
13  yourself for the record, which will be followed by
14  the swearing of the witness by the Court Reporter.
15        MR. STROUD:  Philip Stroud and James
16  Lees for the Plaintiff.
17        MR. HILL:  Ray Hill for the
18  Defendants.
19        A. A. "ARNIE" McMULLEN, having been
20  duly sworn, testified as follows:
21        EXAMINATION
22  BY MR. STROUD:
23        Q.  Sheriff, my name is Philip Stroud.  You and
24  I met before this deposition and talked briefly.
25  Where do you -- have you ever given a deposition

---

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

2

## Page 5

1  before?
2  **A.** Yes.
3  **Q.** How many times would you say?
4  **A.** Just once.
5  **Q.** Okay. And what was that about?
6  **A.** It was on the same -- it was a hanging in
7  the jail.
8  **Q.** Do you remember when that was?
9  **A.** '89 or '90. I'm not sure.
10  **Q.** Do you happen to remember the name of the
11  individual that brought a claim?
12  **A.** Lonnie Cole.
13  **Q.** Since it has been since 1989 or about since
14  you gave your deposition, I'll just tell you a few
15  things I'm sure your counsel has already been over
16  with you. But, obviously, I'll be asking you some
17  questions today and this lady here to my left will be
18  taking down everything that I ask as well as
19  everything you say in response. So it's going to be
20  important that we don't talk over one another. I'll
21  try and give you that courtesy if you'll do the same
22  for me.
23  **A.** I will.
24  **Q.** If you need to take a break at any time,
25  please let me know. This is not a marathon. But if

## Page 6

1  you do want to take a break, let's just get the last
2  question on the table answered before we do it.
3  Okay?
4  **A.** That will be fine.
5  **Q.** What have you reviewed today in preparation
6  for your deposition?
7  **A.** I just went over some of my policies and
8  all.
9  **Q.** Okay. Anything else?
10  **A.** No. That's all.
11  **Q.** Now, when you say you've been over some of
12  your policies, are you referring to policies of the
13  Benton County Sheriff's Department?
14  **A.** Yes.
15  **Q.** Specifically, what policies did you spend
16  time reviewing?
17  **A.** Just our medical and mental policies.
18  **Q.** Medical and mental policies?
19  **A.** Yeah.
20  **Q.** Any others?
21  **A.** No. That's all.
22  **Q.** What about the video of Mr. Sons' hanging
23  that was recorded by the jail?
24  **A.** I've not ever seen it.
25  **Q.** Never seen it?

## Page 7

1  **A.** Unh-unh (Indicating no).
2  **Q.** Okay. Is there a reason why you haven't?
3  **A.** I've just never seen it.
4  **Q.** Okay. Have you ever asked to see it?
5  **A.** No.
6  **Q.** Okay. What about audio from the dispatch,
7  did you listen to any of the audio recordings?
8  **A.** No.
9  **Q.** Okay. Is there a particular reason why as
10  the chief law enforcement officer for Benton County
11  who ultimately would be responsible for investigating
12  a suicide within your jail, why you wouldn't want to
13  actually see the video and investigate what happened?
14  **A.** Well --
15  **MR. HILL:** Object to the form.
16  Assumes facts not in evidence. You can answer.
17  **A.** When something like this happens I just
18  turn it over to MBI, the bureau of investigations.
19  **Q.** (Mr. Stroud) Have you reviewed the MBI
20  investigation report?
21  **A.** No.
22  **Q.** So as we sit here today some year and two
23  or three months after the fact, after Mr. Sons died
24  in your jail, you don't have any idea where the
25  investigation is with MBI?

## Page 8

1  **A.** I've not talked to them. I've not looked
2  at his report or anything. No.
3  **Q.** And you haven't conducted any personal or
4  independent investigation as the chief law
5  enforcement --
6  **A.** No.
7  **Q.** -- officer in Benton County?
8  **A.** No, sir.
9  **Q.** Have you asked any of your agents or
10  employees that are under you at the Benton County
11  Sheriff's Department to conduct any independent
12  investigation?
13  **A.** Well, Chief Batts.
14  **Q.** And that's at your direction?
15  **A.** Yes.
16  **Q.** Okay. Tell me what you told him to do as
17  far as investigating this.
18  **A.** Well, I didn't necessarily tell him. He
19  knows to do it. What I mean, Joe does -- Joe does it
20  for me.
21  **Q.** Okay. Has he ever told you anything he has
22  concluded as a result of his investigation?
23  **A.** Well, we've talked about it just a little
24  bit, you know, as far as -- and then I've read his
25  report, you know.

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

3

---

## Page 9

1    **Q.** So Mr. Joe Batts, the chief deputy,
2  actually completed an investigation report?
3    **A.** Yeah. He just, you know, wrote up a report
4  and I went over it.
5    **Q.** Okay.
6    **MR. STROUD:** Has that been produced,
7  Ray?
8    **MR. HILL:** Yes.
9    **MR. STROUD:** Okay. Just his
10  statement?
11    **MR. HILL:** Yeah. That's what he's
12  talking about. It's called an incident report.
13    **Q.** (Mr. Stroud) Anything else you've done
14  other than ask -- you didn't even ask, you just
15  assumed Mr. Batts would conduct an investigation,
16  right?
17    **A.** Yeah. I knew he would.
18    **Q.** Okay.
19    **A.** I wasn't present. I wasn't there that
20  week. I was off that week when he --
21    **Q.** In your review of what Mr. Batts concluded
22  in his investigative report, did you call for or make
23  any changes to either the personnel there at the
24  department or your policies relating to jail suicide?
25    **A.** All we done was change up some stuff in the

## Page 10

1  cell. As far as changing anything other, you know,
2  we done some changing in the cell there.
3    **Q.** Okay. Tell me what changes you made, if
4  any.
5    **A.** This top bunk that he used, we removed it.
6    **Q.** Who recommended that?
7    **A.** I did.
8    **Q.** Okay. Anything else that was done as a
9  result?
10    **A.** No, sir. Not as far as -- unh-unh
11  (Indicating no).
12    **Q.** How long have you been sheriff of Benton
13  County?
14    **A.** Twenty-three years.
15    **Q.** And in that 23-year period of time, how
16  many other suicides have occurred in your jail to
17  your memory?
18    **A.** We've had three.
19    **Q.** You told me about the one earlier in about
20  1989 or so that you gave a deposition for. Is that
21  one of those three?
22    **A.** Yeah.
23    **Q.** Okay. What are the others if you can
24  recall?
25    **A.** And then I had one in '01 or '02. Joe --

## Page 11

1    **MR. HILL:** You just have to -- if you
2  don't know you don't know.
3    **A.** I don't know just what date.
4    **Q.** Was that Mr. Thompson?
5    **A.** No.
6    **Q.** Who was that?
7    **A.** Oh, good gracious. I can't think of that
8  boy's name now.
9    **Q.** Was it a hanging?
10    **A.** Yes.
11    **Q.** What did that person use to hang themself?
12    **A.** He used a sheet and the bars in that
13  window.
14    **Q.** The bars in the window in the juvenile
15  cell --
16    **A.** Yeah.
17    **Q.** -- that Mr. Parks was in?
18    **A.** Yeah.
19    **Q.** Is that why those bars have since been
20  covered up?
21    **A.** Yeah.
22    **Q.** All right. What about the one in 1989, was
23  that a hanging?
24    **A.** Yeah.
25    **Q.** And what did the person use in that case?

## Page 12

1    **A.** The same thing, the bars in the window.
2    **Q.** And a sheet?
3    **A.** Yeah. Uh-huh (Indicating yes).
4    **Q.** All right. You said there were three.
5    **A.** And I don't remember what year it was that
6  Mr. Thompson done that. I don't remember that year,
7  the date on it.
8    **Q.** Mr. Thompson hung himself as well?
9    **A.** Yes.
10    **Q.** And I understand he didn't hang himself in
11  that same cell?
12    **A.** No, he didn't hang himself. I'm not sure
13  there either. I wasn't there that day. But, now, he
14  didn't -- I don't think he hung himself in that
15  window either, because I think we had done plated
16  them when that happened.
17    **Q.** Plated it? What do you mean?
18    **A.** Put that -- welded the plates over the
19  window of the cells.
20    **Q.** Do you know what Mr. Thompson used to hang
21  himself?
22    **A.** I'm not sure on that. No.
23    **Q.** A bed sheet or a blanket?
24    **A.** I'm not sure.
25    **Q.** And then, of course, the one we're here to

---

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

4

---

Page 13

1 talk about today; Mr. Sons?
2     A.  Uh-huh (Indicating yes).
3     Q.  And those are the only -- so that's
4 actually four suicides?
5     A.  Yeah.
6     Q.  Are those the only ones you can remember?
7     A.  That's all we've had.
8     Q.  Okay.  What about attempted suicides in the
9 jail?
10     A.  I want to think there was one but I'm not
11 sure on it.
12     Q.  Was it an attempted hanging?
13     A.  I'm not sure.  I'm thinking that it was --
14 we had a Dowdy, of course, he was just one of those
15 that would do anything for attention.  I don't think
16 he intended to do anything, but I think he tried it.
17     Q.  And to the best of your recollection, was
18 it prevented by jail staff?
19     A.  Yeah, the jailers, uh-huh (Indicating yes).
20     Q.  And how did they prevent it?
21     A.  I think he seen him and seen what he was
22 doing and got him.
23     Q.  Seen him on video?
24     A.  I think so, yeah.
25     Q.  Do you remember who that was?  Was it

Page 14

1 Mr. Stanton?
2     A.  I'm not sure on what jailer was on that
3 day.
4     Q.  Okay.  Other than Mr. Dowdy, to the best of
5 your recollection do you remember any other attempted
6 suicides in your jail?
7     A.  No.
8     Q.  Okay.  Are you saying that they didn't
9 happen or you just don't recall any?
10     A.  We've not had any other than --
11     Q.  Okay.  Prior to becoming sheriff 23 years
12 ago, did you have any prior law enforcement training?
13     A.  No.
14     Q.  What made you decide you wanted to be
15 sheriff?
16     A.  Just from the way things were going and I
17 just felt like I could maybe help some.
18     Q.  Did you attend yourself the academy?  Did
19 you go down to --
20     A.  The county did.  I went to the sheriff's
21 academy after I was elected.
22     Q.  Since that time, have you -- educate me a
23 little bit.  Do sheriffs have to undergo continuing
24 education as it relates to being certified or keeping
25 a certification?

Page 15

1     A.  No.  We don't have to.  We update it some.
2 We go to the sheriff's association, to the meetings,
3 and it updates us some on all of it.
4     Q.  Were you the -- were you the one
5 responsible for creating and implementing the
6 policies and procedures that are being used today?
7     A.  Yes, sir.
8     Q.  That's your baby?
9     A.  Uh-huh (Indicating yes).  Yeah.  When I
10 came here we didn't have any.
11     Q.  Do you remember when you, after you -- how
12 long after you came, initially came that you actually
13 undertook to implement policies and procedures?
14     A.  I came in office in January of 1988 and
15 immediately afterwards we started, you know, putting
16 it together.
17     Q.  When did you complete the what we now have
18 as the policies and procedures of the jail?
19     A.  You know, we done it, we completed it in
20 '88.  But I'm sure we've, you know, we've updated it
21 as we went along.  But I don't remember the dates of
22 anything on any of that.
23     Q.  Okay.  When is the last time you recall
24 making any official changes to the policies and
25 procedures?

Page 16

1     A.  It was right after Deputy Batts come in
2 with me, I think.  I don't know how many years ago
3 that has been.  But Joe and I, you know, updated it
4 some then.
5     Q.  Did you update at all anything related to
6 suicide prevention or suicide topics?
7     A.  I'm not sure what all we updated on it.
8 And I don't remember updating that, but I'm not
9 saying we didn't, but I don't -- I think that's
10 pretty well what we've had in place, you know.  But
11 I'm not sure.
12     Q.  Okay.  Approximately how long has Joe Batts
13 been with you?  He can't answer.  If you know, you
14 know.
15     A.  When you're as old as I am, time gets away
16 so fast.  I don't know.  Say eight years ago?  Ten
17 years?  I'm not sure.  He has been with me for
18 several years.
19     Q.  So is it a fair statement to say it has
20 been at least eight or ten years since any changes
21 were made to policies?
22     A.  I would say so, yes.
23     Q.  Okay.  And as we sit here today you can't
24 even recall what those changes were?
25     A.  No.  You know, we just kind of changed it

---

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

5

## Page 17

1　up some as we went along on it.

2　　**Q.** Who is responsible for providing training

3　to your jail employees?

4　　**A.** Well, all of my jailers have been certified

5　jailers that went to the school for jailers.

6　　**Q.** As of September 2015 when this incident

7　happened, who were the jailers that were employed by

8　Benton County?

9　　**A.** Who were they?

10　　**Q.** Uh-huh (Indicating yes). How many do you

11　have?

12　　**A.** We've got -- we've got three full-time and

13　then I think we've got two part-time.

14　　**Q.** Is that the same way it was back in

15　September of '15?

16　　**A.** Yes. Uh-huh (Indicating yes).

17　　**Q.** And the three full-time, you obviously have

18　Mr. Batts, you have Johnny Stanton and is it Willie

19　Brown?

20　　**A.** No, we got John -- Mr. Batts is not a

21　jailer. I've got Johnny Stanton and Willie Brown and

22　Daniel -- what's Daniel's last name, Joe? I don't

23　even --

24　　　　**MR. HILL:** Just the best you remember.

25　　**Q.** (Mr. Stroud) If you don't remember. Just

## Page 18

1　somebody named Daniel?

2　　**A.** Yeah. Just Daniel. I don't remember what

3　Daniel's last name is.

4　　**Q.** Full-time jailer. What about part-time

5　jailers, who are they?

6　　**A.** I've got Leon Crawford and James Couch.

7　　**Q.** And it's your testimony that all of these

8　individuals have been through the state certification

9　for jailers?

10　　**A.** Yeah.

11　　**Q.** Okay. Other than the state certification,

12　which is required by the State of Mississippi, do any

13　of -- have any of them had additional training as it

14　relates to jail operation?

15　　**A.** No, not that I know of.

16　　**Q.** That's not something you require as the

17　sheriff?

18　　**A.** No.

19　　**Q.** How many does the jail hold there in Benton

20　County? If you're at full capacity, how many inmates

21　or detainees can you hold?

22　　**A.** Twenty-six. I believe it's 26.

23　　**Q.** Twenty-six beds? And that was the same way

24　back in September of 2015?

25　　**A.** Yeah.

## Page 19

1　　**Q.** And as far as the hours that the jailers --

2　you have three full-time and two part-time. How does

3　that work? Do they work on shifts or what?

4　　**A.** Yeah. A jailer will come in at 6:00 in the

5　morning and he'll work until 2:00. Then another one

6　will come in at 2:00 and work till 10:00, and then

7　from 10:00 till 6:00.

8　　**Q.** So at any given time there's at least one

9　jailer there with one dispatch person?

10　　**A.** Yeah. Uh-huh (Indicating yes).

11　　**Q.** And I guess dispatch is 24 hours a day,

12　right?

13　　**A.** Yeah. Dispatch is 24 hours.

14　　**Q.** Because the dispatch office there at the

15　Benton County jail is also the 911 operator?

16　　**A.** Yeah.

17　　**Q.** Right?

18　　**A.** Uh-huh (Indicating yes).

19　　**Q.** Is that a yes?

20　　**A.** Yes. I'm sorry.

21　　**Q.** That's okay. And so is it also true that

22　given the fact that that desk there in the jail is a

23　911 call center, that somebody has to be at that desk

24　at all times?

25　　**A.** Yes.

## Page 20

1　　**Q.** So I assume, correct me if I'm wrong, that

2　if your dispatcher or the 911 operator has to use the

3　restroom, then there's someone else at the jail that

4　can fill his or her spot while they're out?

5　　**A.** No. I just have one dispatcher. If they

6　have to use the restroom, you know what I mean, I

7　don't have another dispatcher that can sit down

8　there.

9　　**Q.** Okay.

10　　**A.** You know.

11　　**Q.** What if the person needs to take a lunch

12　break or needs to run to the store to pick up

13　something?

14　　**A.** They don't do that. They don't leave the

15　dispatch office. I mean, the restroom is right

16　beside the office. And they don't leave that office,

17　my dispatchers don't.

18　　**Q.** On a typical day where you have, you know,

19　I think the day that this happened with Mr. Sons

20　there was about 13 inmates or detainees in the jail.

21　Is that your recollection?

22　　**A.** I'm not sure. No, sir.

23　　**Q.** On an average day though you at least have

24　a dispatcher there, correct?

25　　**A.** Yeah.

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

6

Page 21

1     Q.  And is it a she?
2     A.  Yes.
3     Q.  What's her name?
4     A.  Well, at the time this happened?
5     Q.  Yes.
6     A.  Was Missy Campbell.
7     Q.  Okay.  And where is Ms. Campbell now?
8     A.  Ms. Campbell passed away in July.
9     Q.  Was she sick?
10    A.  Left work one afternoon at 5 o'clock or at
11    6 o'clock and they called me at 2 o'clock in the
12    morning, they found her dead, her daughter did.
13    Q.  Was it suicide?
14    A.  No.  She just -- I don't know if she had a
15    heart attack or what.  They didn't -- she was in the
16    floor at home when --
17    Q.  So Ms. Campbell was the dispatcher at the
18    time Mr. Sons was in your jail, correct?
19    A.  Yes.  That's correct.
20    Q.  So it would have been at least her there,
21    right?
22    A.  Yes.
23    Q.  Her job responsibility was to stay at that
24    desk and do what?
25    A.  And to dispatch, you know.

Page 22

1     Q.  Answer phones?
2     A.  Yes.
3     Q.  Okay.  Was she the primary contact when the
4     phone rang at the Benton County Sheriff's Department?
5     A.  Yes.
6     Q.  In my -- in our observation at the jail a
7     little while ago I noticed that there was a big video
8     monitor there at her desk as well; is that correct?
9     A.  Yes.
10    Q.  Is that a live feed from the surveillance
11    around the jail?
12    A.  Yes.
13    Q.  Was part of her job responsibility, in
14    addition to dispatch and 911 and answering phones, et
15    cetera, was it to monitor the video?
16    A.  Yes, to a certain extent.  What I mean,
17    they understand that if that 911 line or that phone
18    rings they have to -- you know, that's their job is
19    to take care of that.  And we put the monitor there
20    where, you know, where we could monitor, where they
21    could, you know, if something -- you know, just to
22    watch it, you know, as much as they possibly could.
23    But, now, when that 911 phone or our phone rings then
24    they have to -- you know, that's their job and
25    dispatching my deputies.

Page 23

1     Q.  And the other area where I think
2     Mr. Stanton was sitting today when I went in there,
3     what would you call that room?
4     A.  That's the jailer's office.
5     Q.  Okay.  I also noticed there was a, looks
6     like a big screen there for video as well?
7     A.  Yes.
8     Q.  Where live feed video surveillance from the
9     jail comes there, correct?
10    A.  Uh-huh (Indicating yes).
11    Q.  And is that where the jailer is expected to
12    stay?
13    A.  That jailer is there unless he's booking
14    somebody in or something, that's his -- that's where
15    he stays.
16    Q.  Okay.  I said earlier, and I drew an
17    objection for it, I don't know if that was the
18    reason, but I said that you were the chief law
19    enforcement officer for the county.  Is that a true
20    statement?
21    A.  Yes.
22    Q.  And you're head over the sheriff's
23    department, correct?
24    A.  Yes.
25    Q.  Head over the jail?

Page 24

1     A.  Yes.
2     Q.  And you're head over all the employees of
3     the department in the jail, correct?
4     A.  Yes.
5     Q.  And I think you told me earlier that you're
6     head over or responsible for all policies and
7     procedures that are utilized in the department and in
8     the jail?
9     A.  Yes.
10    Q.  You're in charge of any training as it
11    relates to deputies; is that right?
12    A.  Well, all my deputies are certified through
13    the training academy.
14    Q.  If any of your deputies you feel need
15    additional training in certain areas it's your
16    responsibility to see that they get it?
17    A.  Yes.
18    Q.  As well as training for your sheriff's
19    department staff, correct?
20    A.  Yes.
21    Q.  Was Mr. Batts, for no better way of saying
22    it, your eyes and ears in the jail?
23    A.  Excuse me?
24    Q.  Was Mr. Batts back in September of '15 your
25    eyes and ears in the jail?

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

7

Page 25

1     **A.** Yes, sir. What I mean, Mr. Batts, if I'm
2 not there then he's the one that takes over.
3     **Q.** What hours were you typically working or do
4 you typically work at the jail?
5     **A.** Neither one of us have any set hours.
6 We're in and out of that jail at all hours.
7     **Q.** On an average day though when not much is
8 going on, do you and Mr. Batts kind of camp out at
9 the jail?
10     **A.** Well, we're around there, you know, doing
11 paperwork, first one thing and another and, you know,
12 just keeping things on track. But we're there pretty
13 much but not -- you can't stay around the jail.
14     **Q.** Why is that?
15     **A.** Some of these people, when they want $10 or
16 they want to do this or somebody is wanting this and
17 wanting that and they see your vehicle there, then
18 it's hard to -- you know, folks -- in a rural county
19 like this, everyone knows everybody, they're always
20 wanting this and wanting that, you know. So we
21 don't -- we don't stay around the jail much. You
22 know, unless we -- we're around there a lot but not a
23 whole lot. We don't sit there seven or eight hours a
24 day.
25     **Q.** Do you believe, Sheriff, that it's

Page 26

1 essential for your jailers and your staff at the
2 Benton County jail to be well trained?
3     **A.** Yes, I do.
4     **Q.** And you mentioned state certification.
5 Were you referring to the jailer officer standard
6 training offered --
7     **A.** Yes.
8     **Q.** -- through Mississippi Department of Public
9 Safety?
10     **A.** Yes. Whatever the training that's required
11 for them.
12     **Q.** Okay. You believe, Sheriff, that it's
13 essential that the jailers that work for you at the
14 Benton County Sheriff's Department and the staff
15 there have all the tools necessary to them to do
16 their job?
17     **A.** Yes.
18     **Q.** Do you believe that the jailers and staff
19 at the Benton County Sheriff's Department, that it's
20 essential for them to have the tools necessary to
21 provide for the safety and well-being of those who
22 are being housed there?
23     **A.** Do I believe it? Yes.
24     **Q.** Do you believe that it's important for
25 jailers and the staff at the Benton County Sheriff's

Page 27

1 Department to have up-to-date training and
2 comprehensive policies and procedures at their
3 disposal to provide for the safety of the inmates
4 there?
5     **MR. HILL:** Object to the form of the
6 question. You can answer.
7     **A.** I feel that if, you know, if I feel they
8 need it or if they feel they need it and tell me, you
9 know, then we'll do that.
10     **Q.** (Mr. Stroud) I mean, the question was
11 though, do you believe that it's essential for them
12 to have up-to-date training?
13     **A.** Yes.
14     **Q.** And do you believe that it's essential for
15 them to have comprehensive policies at their disposal
16 to make sure that inmates are safe?
17     **A.** Yes.
18     **Q.** Do you believe it's important as the chief
19 law enforcement officer for the county for you to
20 always be monitoring the effectiveness of the
21 department's policies?
22     **A.** Yes.
23     **Q.** Do you do that?
24     **A.** Yes, we pretty well do.
25     **Q.** Do you believe it's important when you find

Page 28

1 that policies aren't effective and they're not
2 working that you make changes to outdated or
3 ineffective policies?
4     **A.** Yes.
5     **Q.** Do you believe that as of September 19,
6 2015, that Benton County Sheriff's Department jail
7 policies and procedures were adequate to ensure the
8 safety of the detainees in your jail?
9     **A.** Yes.
10     **Q.** Would you say that you're the most
11 knowledgeable person within the Benton County
12 Sheriff's Department to discuss policies and
13 procedures within the jail?
14     **A.** All right. Say that one more time.
15     **Q.** Sure. Would you be the most knowledgeable
16 person, since you created and implemented the
17 policies, to discuss the policies and procedures
18 within the jail?
19     **A.** Well, I wouldn't say I'd be the most
20 knowledgeable, no. I mean, chief deputy and myself,
21 we discuss it, you know. We would discuss it and
22 then if we feel it needs updated or something then
23 we --
24     **Q.** Your attorney provided me with a copy of
25 some policies and procedures. I'm going to ask you,

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

8

### Page 29

1  if you would, to look through this and tell me if
2  this is what you were referring to that you
3  implemented at Benton County Sheriff's Department?
4      A.  Yeah. I'm sure this is it. (Witness
5  reviews document.) Yes. This is going to be it.
6      Q.  Okay. It looks like several of these --
7  well, really each page may end up having a different
8  font or a different size font. Do you notice that?
9      A.  A different what now?
10      Q.  Different -- it looks like they were typed
11  at different times or that they were gathered from
12  different sources. Does that make sense?
13      A.  Yes. It could possibly be.
14      Q.  When you were creating or implementing
15  these policies, did you just find policies you liked
16  from other places and copy them and kind of put them
17  in there?
18      A.  I started this -- when I come in here I was
19  a truck driver. And I walked in here and I checked
20  around and my policies started from DeSoto County's.
21      Q.  Okay.
22      A.  And that's where I started my policies and
23  procedures from DeSoto County's deal.
24      Q.  So you contacted then Sheriff Riley, I
25  assume?

### Page 30

1      A.  Yeah, Sheriff Riley.
2      Q.  Okay. And he was willing to provide you
3  with a copy of theirs?
4      A.  Yeah. And that's how this all got started.
5  And then since I've, you know, just updated it along.
6  But that's where it got -- that's where I started it
7  from.
8      Q.  Okay. Let me see this real quick. So if I
9  were to check DeSoto County's policies from 23 years
10  ago and compare it with what I'm looking at here
11  today --
12      A.  It should be pretty much the same.
13      Q.  Okay.
14      A.  That's how I started these policies.
15      Q.  Okay. I'll show you -- you said you
16  reviewed this portion of the policy in preparation
17  for your deposition, correct?
18      A.  Uh-huh (Indicating yes).
19      Q.  That deals with the subject of suicide and
20  attempted suicide?
21      A.  Uh-huh (Indicating yes).
22      Q.  And you see how the first sentence here
23  says, the policy -- read that for me, if you would.
24      A.  "To make every effort possible to prevent
25  suicide or attempted suicide."

### Page 31

1      Q.  And the next sentence?
2      A.  "To protect the physical and mental health
3  of all inmates and the staff of the Benton County
4  Sheriff's Department."
5      Q.  Do you see where it says to protect the
6  physician, not physical? It actually says the word
7  physician?
8      A.  Yeah, it's physician.
9      Q.  That's a typo obviously?
10      A.  Yeah.
11      Q.  Would that typo have been the same in
12  DeSoto County's policy?
13      A.  I don't know now. That's what I say.
14  We've updated it along. I don't know if that would
15  be the same or not.
16      Q.  And you see where it says, where it says
17  Benton County Sheriff's Department. That appears to
18  be in a different --
19      A.  Yeah.
20      Q.  Like it was typed in there. Do you see
21  that?
22      A.  Yeah.
23      Q.  Do you recall taking that and maybe whiting
24  out DeSoto County and putting Benton County?
25      A.  That has been twenty-something years ago.

### Page 32

1  I don't know.
2      Q.  That's what it looks like though, doesn't
3  it?
4      A.  But, you know, I don't know. I don't know
5  on that.
6      Q.  That's what appears to have happened
7  though, right?
8      A.  Yeah. Uh-huh (Indicating yes).
9      Q.  The same thing goes for the next page, Page
10  2, where it says, "A complete written report shall be
11  submitted to the jailer on duty as soon as possible
12  to the," and it looks like somebody filled in the
13  sheriff or chief deputy.
14      A.  Sheriff or chief deputy. Uh-huh
15  (Indicating yes).
16      Q.  That would have been something I guess you
17  or somebody in your office would have typed in there?
18      A.  I'm sure. I'm sure it would have been,
19  yeah.
20      Q.  Are these policies and procedures on a
21  computer where you can edit them or are they just --
22  there's a copy in a file somewhere where you made
23  copies to give to employees?
24      A.  Yeah. I just made copies and give to
25  the -- now, as far as I know, I'm not a computer man

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

9

---

**Page 33**

1  so as far as I know it's not, unless Deputy Batts may
2  have it on one.
3  　　Q.  Sure.  So the changes you would have made
4  over the past 23 years we could pretty well go in and
5  see just because it would be a different font, right?
6  　　A.  Possible, yeah.
7  　　Q.  Because you don't have the access to go
8  into a computer and actually back up and retype,
9  right?
10  　　A.  Not that I'm familiar with.
11  　　　　MR. STROUD:  Okay.  Let's mark this as
12  Exhibit 1 to your deposition.
13  　　　　(Exhibit No. 1 -- Policy and
14  Procedures for Jail Facility -- marked and may be
15  found attached to the transcript.)
16  　　Q.  (Mr. Stroud)  We've talked about this
17  already, Sheriff, but what I've marked as Exhibit 1,
18  these are all the written policies and procedures
19  that govern the operation of the jail, right?
20  　　A.  Uh-huh (Indicating yes).
21  　　Q.  There aren't some someplace else that we
22  just haven't seen?
23  　　A.  No.
24  　　　　MR. HILL:  Can I compare the exhibit
25  to what we have?

---

**Page 34**

1  　　　　MR. STROUD:  Sure.
2  　　Q.  (Mr. Stroud)  Now, is it your
3  responsibility to see that the policies and
4  procedures that we've marked as Exhibit 1 are
5  followed in your jail?
6  　　A.  Yes.
7  　　Q.  And how are employees when they're first
8  hired trained on these policies and procedures, apart
9  from giving them a copy?
10  　　A.  Yeah.  Each one has got a copy of it.  You
11  know, we give each employee a copy of it.  And as far
12  as trained --
13  　　Q.  They're supposed to be able to read?
14  　　A.  Yeah.
15  　　Q.  Okay.  It's a learn on the job kind of
16  thing, right?
17  　　A.  Yeah.
18  　　Q.  So when a new employee comes in, as far as
19  training on policies and procedures, they're given a
20  copy of it and then they're just expected to read it?
21  　　A.  We give them a copy, but also the other
22  jailers, you know, as they come in, if I hire a new
23  employees then another jailer works with him until,
24  you know, until -- he stays with him until he's able
25  to do it by himself.

---

**Page 35**

1  　　Q.  As far as you know though, nobody sits down
2  and goes through them with each new hire, they're
3  just expected to read it, right?
4  　　A.  Yeah.  We just --
5  　　Q.  I didn't -- I looked through the policies.
6  I didn't see anything in your policies as it relates
7  to preservation of evidence.  Do you know what I mean
8  by that?  Does the jail have a policy whereby if
9  something bad happens, someone commits suicide,
10  someone dies, something bad happens in the jail, that
11  the jail preserves evidence related to that incident?
12  　　A.  All right.  Now, you're running off and
13  leaving me a little bit.  The evidence --
14  　　Q.  Sure.  Do you have any policies that you
15  require of your jailers or the Benton County
16  Sheriff's Department that says, hey, evidence has got
17  to be preserved and this is how it has to be
18  preserved?
19  　　　　MR. HILL:  Do you mean written
20  policies?
21  　　Q.  (Mr. Stroud)  Yes.  Written policies.
22  　　A.  I don't guess.  Because on that, it's like
23  I said awhile ago, we turned it over to MBI.  You
24  know, we don't bother any of it.  They take it all.
25  　　Q.  For example, the video surveillance in the

---

**Page 36**

1  jail, when we were there today I think I counted at
2  least four or five video cameras in that jail; is
3  that right?
4  　　A.  Uh-huh (Indicating yes).  Yeah, there are
5  several in it.
6  　　Q.  Do you have a policy, a written policy that
7  says if something happens in the jail, like a
8  suicide, that your jailers are to preserve all the
9  video evidence related to that inmate?
10  　　A.  Well, we automatically do that.
11  　　Q.  Okay.  And what -- do you have a policy, a
12  written policy though that says they're to do that?
13  　　A.  I don't know on that now, because we
14  haven't had the cameras all that long.  I'm not sure
15  if we have that or not.
16  　　Q.  As sheriff do you have an unwritten policy
17  that you tell your jailers, hey, if something like
18  this happens I want you to do X?  What do you tell
19  them to do?
20  　　A.  Yeah, they know.
21  　　　　MR. HILL:  Object to the form of the
22  question.  You can answer.
23  　　A.  You know, they won't get rid of anything.
24  No, sir.
25  　　Q.  (Mr. Stroud)  How long does the video

---

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

## Page 37

1   surveillance record to the hard drive?

2       A.   I'd have to check.  I'm not sure just how

3   long it goes before -- Chief Batts could tell you

4   that.  I'm not sure.

5       Q.   Are you aware whether it's taped over if

6   you don't preserve it or whether it just stays out

7   there?

8       A.   I'm not sure on it.  It stays for quite a

9   while but I'm not sure how that works.

10      Q.   Do you, the sheriff, know what video was

11  preserved in this case and what video was not

12  preserved?

13      A.   That's what I say.  We turned it all over

14  to MBI and they, you know, they took it.

15      Q.   With all due respect, Sheriff, though the

16  MBI didn't come in and download video from your

17  server.  Somebody in your jail actually provided them

18  with a CD, correct?

19      A.   Yes.

20      Q.   Okay.  So do you know as we sit here today

21  what evidence was preserved and what wasn't

22  preserved?

23      A.   No.

24      Q.   Could you see how it would be important for

25  an investigation to preserve all video?

## Page 38

1       A.   Oh, yeah.

2       Q.   Not just the video of someone hanging?  The

3   video of the hallway, for instance, outside to see

4   whether he was being checked on, would that be

5   important to you as sheriff to know what was going on

6   before he died?

7       A.   All right.  Now, you're leaving me again

8   now.

9       Q.   Sure.  Would it be important to you as

10  chief law enforcement officer for the county for

11  purposes of investigating a suicide in your jail to

12  preserve all video in the jail --

13      A.   Yeah, it would.

14      Q.   -- not just within the cell?

15      A.   Yeah, it would.

16      Q.   Okay.  Why?

17      A.   Why?

18      Q.   Uh-huh (Indicating yes).

19      A.   Where I could watch what goes on outside

20  the jail as well as inside the cell.

21      Q.   Right.  Is that important to you?

22      A.   At a time like this it would be, yeah.

23      Q.   Tell me why it would be important to you.

24      A.   Well, it just would.  You know, it would

25  just be important to see what was going on around it

## Page 39

1   to me.  I mean, I'm not -- it would just be --

2       MR. HILL:   Philip, I don't mean to

3   interrupt, but Exhibit 1 appears to be -- have

4   several differences between what I've produced.

5       MR. STROUD:   Okay.

6       MR. HILL:   I would suggest that we

7   simply use what I produced to you.

8       MR. STROUD:   That's fine.

9       MR. HILL:   I think I have a full set.

10      MR. STROUD:   I think what I did was I

11  removed the jail policies from the sheriff's

12  department policies.

13      MR. HILL:   Okay.

14      MR. STROUD:   So if you want to include

15  the entire thing and substitute it, that's fine, as

16  long as he identifies it.

17      MR. HILL:   Okay.  Let's do that now

18  before we forget.  Regina, if you'll just give me

19  another one.  This is what I produced to the other

20  side.  So he wants you to identify it.

21      MR. STROUD:   Make sure it's accurate

22  and complete.

23      THE WITNESS:   (Witness examines

24  documents.)  This appears to be it.  I think it's

25  going to be it.  That's going to be it.

## Page 40

1       Q.   (Mr. Stroud)  Okay.  You've identified what

2   we've now marked as Exhibit 1 to your -- remarked as

3   Exhibit 1 to your deposition to be a complete copy of

4   the policies and procedures, correct?

5       A.   Yes.

6       Q.   Okay.  All right.  Let me switch your

7   attention, if we could, to the case we're here today

8   to discuss; Mr. Sons.  As I understand it, Sheriff,

9   there was a live video -- there was a video camera in

10  the corner of Mr. Sons' detention cell, correct?

11      A.   Uh-huh (Indicating yes).

12      Q.   You have to answer.

13      A.   Yes.

14      Q.   Okay.  And that camera provided a live

15  video feed to not only the dispatcher's desk where

16  she has a large screen TV there, correct?

17      A.   Yes.

18      Q.   But also provides the same live video

19  feed to the jailer's desk where he also has a similar

20  large screen TV, correct?

21      A.   Yes.

22      Q.   Now, given the length of time it took for

23  Mr. Sons to tear his bed sheet, create a rope, tie it

24  through the top hole of his bunk, wrap it around his

25  neck and commence to hang himself, why did no one

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

## Page 41

1  intervene?

2     **A.** I don't know. I don't know what -- that's

3  what I say. I wasn't there and I've not seen the

4  video on it.

5     **Q.** What investigation, if any, did you

6  personally do to determine who dropped the ball?

7       **MR. HILL:** Object to the form. Asked

8  and answered. You can answer again.

9     **A.** Well, I don't know who dropped it. You

10  know, I don't know. But I'm not -- I don't know.

11     **Q.** (Mr. Stroud) Can we agree that somebody

12  within the sheriff's department screwed up?

13       **MR. HILL:** Object to the form.

14     **A.** Well, I wouldn't say they screwed up, no.

15  I wouldn't say that.

16     **Q.** (Mr. Stroud) Why?

17     **A.** Well, you know, I don't have a -- I can't

18  afford to hire a man to sit there and watch that

19  screen, you know, 24 hours a day. I don't have that.

20  I've got jailers that has to do their jailing job.

21  I've got dispatchers that have to do their

22  dispatching job. And I just don't have it, you know.

23  And I'm not going to say who it was. The jailers,

24  that all happened around lunchtime, the jailers are

25  responsible for feeding those inmates at lunchtime.

## Page 42

1  So I don't know. I wasn't there and I don't know --

2  I don't know what that jailer was doing and I'm sure

3  the dispatcher was dispatching and I don't know. You

4  know, I'm not sure. But I don't have anybody that

5  can watch that monitor 24 hours.

6     **Q.** Who was the jailer that was charged with

7  the responsibility of being at the jailer's desk and

8  monitoring that day?

9     **A.** Johnny Stanton was there I think that day.

10     **Q.** Have you, as chief law enforcement agent

11  for the county, gone to him and asked him, "Johnny,

12  what happened?"

13       **MR. HILL:** Object to the form. Asked

14  and answered. You can answer again.

15     **A.** Yes, I've talked to him about it.

16     **Q.** (Mr. Stroud) What did he say?

17     **A.** And he said he don't know. He was in and

18  out of that dispatch -- out of the jailer's office at

19  that time. But I don't really know what -- you know,

20  I -- that's what I say. I can't answer for him

21  because I don't know. I just don't know.

22     **Q.** Can we agree that the entire time Mr. Sons

23  was in that juvenile cell that it was on video?

24     **A.** Yes.

25     **Q.** And it was working?

## Page 43

1     **A.** Yes.

2     **Q.** It was recording?

3     **A.** Yes.

4     **Q.** That it was available to be viewed if

5  someone chose to view it from either the dispatcher's

6  chair or from the jailer's chair?

7     **A.** They could see the monitor, they could see

8  it, yes.

9     **Q.** Video quality was fine, wasn't it?

10     **A.** Yes.

11     **Q.** So there was nothing prohibiting either the

12  dispatcher or the jailer on duty, Mr. Stanton, if

13  they had been at the observation chair to actually

14  see Mr. Sons attempting to hang himself if they had

15  just looked, right?

16     **A.** I don't know how to -- they could see he

17  was doing something. But Mr. Sons, he tied that

18  around his neck and sat down. You know, it wasn't as

19  if he were hanging from the ceiling, you know. He

20  was sitting in the floor. So I -- you know, if I had

21  been there I don't know if I would have noticed that

22  he had done choked himself to death. I don't know.

23  I don't know.

24     **Q.** And you've never seen the video so you

25  can't opine on that, can you?

## Page 44

1     **A.** No.

2     **Q.** Now, let me shift your attention to when

3  Mr. Sons arrived at Benton County jail. Do you know

4  why he came to the jail?

5     **A.** I didn't at that time, no. I wasn't there.

6     **Q.** At what time?

7     **A.** When he was brought in. I don't know.

8     **Q.** As we sit here today do you know why he had

9  been brought to the jail?

10     **A.** Yes. I know now why he had been brought

11  in.

12     **Q.** Why?

13     **A.** His father wanted him locked up.

14     **Q.** Why did his father want him locked up?

15     **A.** He was afraid of him. Now, this is what

16  I -- now, I didn't talk to Mr. Sons beforehand. This

17  is just what I -- I talked to him afterwards.

18     **Q.** You never talked to Mr. Sons prior to his

19  son killing himself?

20     **A.** No.

21     **Q.** Is it a fair statement to say, Sheriff

22  McMullen, that prior to Mr. Sons committing suicide

23  you had not heard about Mr. Sons or what Mr. Sons,

24  the father, had said as to why he was committing his

25  son to the jail?

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

12

## Page 45

1   **A.** I never talked to Mr. Sons until after it
2   was over with. That morning after it was over with I
3   came into the office as soon as I found it out and I
4   met with Mr. Sons and I think it was his wife I met
5   with up there in the office.
6   **Q.** So the first time you even knew anything
7   about why Mr. Sons had brought in his son Jimmy and
8   committed him to the jail was after the suicide
9   occurred?
10  **A.** Yes.
11  **Q.** You're sure about that?
12  **A.** I wasn't there that week. I know I didn't
13  see him.
14  **Q.** I'm not asking whether you saw him. I'm
15  asking you whether you knew anything about why he
16  committed him to the Benton County jail prior to
17  committing suicide?
18  **A.** Not that I know of. Unh-unh (Indicating
19  no). I talked with Mr. Sons and all of this come up
20  afterwards.
21  **Q.** So is it a fair statement to say that prior
22  to -- do I understand your testimony correctly that
23  prior to Mr. Sons committing suicide you didn't have
24  any reason to believe that Sons was a suicide risk?
25  **A.** Unh-unh (Indicating no).

## Page 46

1   **Q.** Is it also a fair statement or do I
2   understand you correctly that prior to Mr. Sons
3   committing suicide you had never heard of him doing
4   anything that would lead you to believe that he was a
5   suicide risk?
6   **A.** I never met Mr. Sons.
7   **Q.** I'm not asking whether you met him. I'm
8   asking whether you heard of anything prior to Sons
9   committing suicide that would lead you to believe
10  that he was a suicide risk?
11  **A.** No.
12  **Q.** Do you recall being contacted by the --
13  strike that.
14      **MR. STROUD:** Let's take a quick break.
15      **THE VIDEOGRAPHER:** We're off the
16  record at 11:13.
17      (Recess.)
18      **THE VIDEOGRAPHER:** Back on record at
19  11:19.
20  **Q.** (Mr. Stroud) Okay. I want to go back, if
21  I could, Sheriff, to the discussion we were having
22  about the dispatcher and jailer's obligation to watch
23  the video monitors. We talked about that briefly. I
24  believe what you were telling me was that you don't
25  have the budget or the manpower to ensure that

## Page 47

1   someone is sitting watching a monitor all day,
2   correct?
3   **A.** Yes. That's right.
4   **Q.** I think the words you used were, with
5   regard to the dispatcher, that she's to watch the
6   monitor as much as she can.
7   **A.** The dispatchers, you know, they've got it
8   to where they can see it. Yeah.
9   **Q.** And as much as she can by doing her other
10  jobs, I think that's what you told me, correct?
11  **A.** Well, you know, they don't sit there just
12  glued to it but they watch it. Yeah.
13  **Q.** How does your policy or procedure change
14  within the jail or your expectations of your
15  employees change within the jail from the task of
16  watching it as much as you can among your other job
17  duties to something more definitive when you have a
18  known suicide risk within the jail?
19  **A.** A known suicide risk?
20  **Q.** How does it change? What do the policies
21  require?
22  **A.** I don't understand a known suicide risk. I
23  don't -- I'm not --
24  **Q.** Did you consider this Mr. Sons to be a
25  known risk of suicide?

## Page 48

1   **A.** Well, I guess you'd say that, but I had no
2   reason to -- he had not shown me anything to suspect
3   suicide.
4   **Q.** You had never seen him.
5   **A.** I had never seen him. But, you know, as
6   far as I know he hadn't attempted a suicide or
7   anything.
8   **Q.** Okay. Did you change any of your policies
9   and procedures from watching the monitor as much as
10  you can to putting a specific watch on him at any
11  time during his stay?
12  **A.** No. The only thing that we have changed is
13  that we took the bed down in the cell and I put a
14  board by the door for them to sign if they've got a
15  suicide risk in it or, you know, they sign that
16  board. I want them to sign it and time it and date
17  it every 15 minutes since then.
18  **Q.** I'm not talking about after he committed
19  suicide, I'm talking about before. Did you make any
20  changes to your policy as it relates to Mr. Sons with
21  regard to monitoring him as a known suicide risk?
22  **A.** No.
23  **Q.** If you have someone in your jail that is a
24  known suicide risk, and I understand you're telling
25  me that you didn't know, right?

Ex. 10 to MSJ

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

13

---

Page 49

1    **A.** Yes.

2    **Q.** But if you have someone in your jail that

3    is a known suicide risk, what definitive changes do

4    you make to the policy that's in place now for a

5    dispatcher to watch the monitor as much as she can to

6    watching it more closely?

7    **A.** There's not any. What I mean, I'm doing

8    the best I can do, you know. I don't have any way of

9    changing it.

10    **Q.** So Mr. Sons was monitored the same way

11    every other inmate is monitored?

12           **MR. HILL:** Object to the form of the

13    question. Assumes facts not in evidence. You can

14    answer.

15    **A.** He was monitored more closely because of

16    where he was at, Mr. Sons would have been.

17    **Q.** (Mr. Stroud) But you could have easily --

18    suicide risk inmates aren't the only ones that go in

19    the J cell, are they?

20    **A.** If we got one, that's the only place he

21    goes, you know, is right there. The others don't go

22    in there. Now, if we're not full -- you know, if

23    we're full and we don't have a suicide or a mental

24    case, then we use that cell for others.

25    **Q.** Is that why Mr. Sons was put in there?

---

Page 50

1    **A.** He asked to be put in there from what I

2    understand.

3    **Q.** Did you understand that Mr. Sons was ever

4    placed in the J cell because he was a known suicide

5    risk?

6    **A.** I just heard that he asked -- he asked to

7    be put in by himself.

8    **Q.** As far as you know he wasn't a known

9    suicide risk, right?

10    **A.** At that time, no, I didn't know.

11    **Q.** Where did you get the understanding that

12    Sons asked to be moved to the J cell?

13    **A.** From the jailers.

14    **Q.** Mr. Batts told you that?

15    **A.** From Mr. Batts and the jailers. I found

16    out that day that he had asked, that's where he

17    wanted to be was by himself.

18    **Q.** So is it a fair statement to say that for

19    Mr. Sons' case in particular, since you didn't know

20    him to be a suicide risk at all prior to him

21    committing suicide, that as far as your policy and

22    procedure for monitoring him he would have been

23    monitored as much as anybody else in that jail?

24           **MR. HILL:** Object to the form. Asked

25    and answered. He testified the exact opposite.

---

Page 51

1           **MR. STROUD:** He can answer. You don't

2    need to tell him how to testify.

3           **MR. HILL:** I'm not.

4           **MR. STROUD:** He can answer. He's a

5    big boy.

6           **MR. HILL:** You're repeatedly asking

7    the same question. You can answer again.

8    **A.** All right. Monitored --

9    **Q.** (Mr. Stroud) Was he monitored the same way

10    everybody else was monitored that day by the

11    dispatcher and by Mr. Stanton?

12           **MR. HILL:** Same objection.

13    **A.** We watch that cell. What I mean, he --

14    like I say, I don't have anybody to sit and watch

15    that monitor 24 hours. I don't have that. And the

16    jailer monitors that cell. If we've got a mental

17    case in it then we monitor it, you know, we watch it

18    as much as possible.

19    **Q.** (Mr. Stroud) Okay. So it doesn't

20    necessarily change from the way it's done before if

21    you have a mental commitment in there, you just watch

22    it as much as possible, right?

23    **A.** Yeah.

24    **Q.** There's no policy or procedure that you're

25    aware of that creates a heightened monitoring of

---

Page 52

1    someone who's in a mental condition?

2    **A.** No.

3           **MR. HILL:** Object to the form of the

4    question.

5    **Q.** (Mr. Stroud) So if a mentally ill

6    individual or someone who's there on a mental

7    commitment that's in custody waiting to be

8    transferred to a mental facility asked to be placed

9    somewhere where he or she could be alone, does that

10    raise any red flags at Benton County Sheriff's

11    Department jail?

12    **A.** We put -- all of our mental cases we pretty

13    well isolate them on it.

14    **Q.** You isolate them and you monitor them as

15    much as you can?

16    **A.** Yeah.

17    **Q.** When was the first time you had a chance to

18    review Mr. Sons', no better way of saying it, jail

19    paperwork, the Writ, the intake form, things like

20    that?

21    **A.** Are you into his jailing sheets and all?

22    **Q.** Yes.

23    **A.** I looked at them the other day in here.

24    That's all I did.

25    **Q.** So you hadn't seen them at all --

---

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

14

## Page 53

1    A.  No.

2    Q.  -- until a couple of days before this

3    deposition?

4    A.  No.

5    Q.  Okay.  Now, I know you say you had no idea

6    that he was a risk for suicide prior to his suicide,

7    right?

8    A.  Right.

9    Q.  Based upon your review of the documents, do

10   you see now that he was a suicide risk?

11   A.  I do now, yeah.

12   Q.  And these documents would have been

13   available to all your jailers, right?

14        MR. HILL:  Object to the form.

15   A.  They would have been there.  I'd say they

16   would have been.  We -- on a mental case we get some

17   papers that day that they're admitted and then some

18   papers we don't get for another day or so from the

19   courthouse.  Now, I haven't been through it, but, you

20   know, I don't know what dates he was brought in.  I

21   don't know.

22   Q.  (Mr. Stroud)  All the paperwork for a Writ

23   to Take Custody for a mental commitment that's coming

24   to your jail, you have access to those documents, do

25   you not?

## Page 54

1        MR. HILL:  Object to the form.

2    A.  Yeah.  Just like in this case the boy's dad

3    signed the papers to have him picked up and

4    committed, then we have to get the papers from the

5    courthouse, you know, to do it and we go get them.

6    Q.  (Mr. Stroud)  Do you know whether the jail

7    had any of the paperwork prior to him committing

8    suicide?

9    A.  I don't know.

10   Q.  In your conversations with Mr. Batts or any

11   of your other jailers, do you understand that your

12   jailers or administrative staff or anyone else that

13   worked for you in that jail had knowledge that Mr.

14   Sons was a suicide risk?

15   A.  I don't know.  I wasn't there.  That's what

16   I'm saying.

17   Q.  I understand.  But in your conversation

18   with them have you learned that they were aware that

19   he was a suicide risk before he killed himself?

20   A.  Well, I talked with Deputy Batts, yeah,

21   then I talked to his dad afterwards.

22   Q.  Mr. Batts, when you talked to him, did he

23   tell you that he was aware that he was a suicide risk

24   before he killed himself?

25   A.  He just told me the same thing his dad told

## Page 55

1    me, that his dad was afraid of him and he was afraid

2    he was going to hurt himself or hurt somebody.  He

3    was more afraid he was going to hurt someone than he

4    was himself, I think.  He was scared to go home.

5    Q.  And as your chief deputy in the Benton

6    County jail, what would your policies and procedures

7    require of Mr. Batts if he learned that someone was

8    coming to your jail as a mental commitment that was a

9    suicide risk?

10   A.  Any mental commitment is a suicide risk.

11   Q.  What policies and procedures or mandates

12   from you as sheriff, the chief law enforcement for

13   the county, would you put on Chief Deputy Batts if he

14   had that heightened information about Mr. Sons prior

15   to committing suicide?

16   A.  Okay.  You're leaving me again.  What

17   policy would I put on Mr. Batts?

18   Q.  Yeah.  What would you require of Mr. Batts

19   based on your policies and procedures?

20   A.  To follow the policies and procedures we

21   have in place.

22   Q.  Specifically, what would you require of him

23   if he knew, he was on scene and he knew that somebody

24   was coming to your jail as a mental commitment and

25   was a suicide risk, what would you require of him?

## Page 56

1    A.  The same as this.  Our policies, I expect

2    him to go by policies.

3    Q.  What policies would you expect him to

4    follow?

5    A.  What we wrote up right here.

6    Q.  In your own words, tell me what you would

7    have expected him to do.

8    A.  I don't know.  I still don't understand.

9    You're leaving me as far as expecting him to do.  I

10   expect him to do his job.

11   Q.  Would you have expected Chief Batts,

12   knowing what he knew about Mr. Sons' suicide risk

13   before he killed himself, would you have expected him

14   to do and the jailers to do everything they did in

15   this case?

16        MR. HILL:  Object to the form.  We're

17   assuming what Joe knew or did not know.  But you can

18   answer to the effect you know.  Go ahead.

19   Q.  (Mr. Stroud)  Did they do everything like

20   you would have expected them to do?

21   A.  Yeah.

22   Q.  You wouldn't have asked them to change

23   anything?

24   A.  I don't know what they could have changed.

25   Q.  Based on your understand of the policies

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

## Page 57

1    and procedures, they followed them?

2    A. Yes.

3    Q. So what happened?

4         MR. HILL: Object to the form of the

5    question.

6    A. So what happened?

7    Q. (Mr. Stroud) If policies and procedures

8    were followed --

9    A. Uh-huh (Indicating yes).

10   Q. -- how did Mr. Sons fall through the

11   cracks?

12   A. I don't know.

13   Q. To the best of your knowledge, in your

14   conversation with Mr. Batts or anyone else at the

15   jail, was Mr. Sons ever officially placed on any form

16   of suicide watch or prevention?

17   A. Well, he was placed -- he was treated like

18   all other mental cases that we bring in. What I

19   mean, he was placed in that cell and he was watched.

20   And like I told you, I can't watch it 24 hours. You

21   know, I just don't have the manpower to do it.

22   Q. How often would you expect or do you

23   require that your jailer or dispatcher watch a mental

24   commitment?

25   A. It's not required. You know, I expect them

## Page 58

1    to watch it as much as possible, but they just can't

2    watch it all the time.

3    Q. Sheriff, do you believe that the policies

4    and procedures that you've been talking about and

5    we've identified as Exhibit 1 are adequate to protect

6    detainees within your jail from suicide risk?

7    A. Yes.

8    Q. Tell me when you were first notified.

9    A. It was on a Saturday morning and I was in

10   Memphis unloading a load of grain. I was off that

11   week helping these farmers haul grain and that's

12   where I was at.

13   Q. Who contacted you?

14   A. Missy Campbell.

15   Q. And tell me about that conversation.

16   A. She just told me that we had an inmate that

17   had hung himself.

18   Q. Did she tell you who it was?

19   A. Yes. She told me it was a Mr. Sons.

20   Q. What response, if any, did you give her?

21   A. I told her I'd be there as soon as I could

22   get there.

23   Q. Did it come as a surprise to you?

24   A. Yes.

25   Q. When did you arrive at the jail?

## Page 59

1    A. I don't know what time. I know I just left

2    there as soon as I got unloaded, I left there and

3    come right on in.

4    Q. When you arrived was MBI already there?

5    A. I believe they were already here. I'm not

6    sure. I believe they were but I'm not sure.

7    Q. Was Mr. Sons, had he been moved at that

8    point?

9    A. He was still there.

10   Q. Tell me what you did, if anything, when you

11   arrived?

12   A. I didn't. I just looked and that was it.

13   And then when I turned it -- that's what I say, we

14   turned it over to MBI and that way, you know, it's --

15   Q. Who else was there with you? Was Mr. Batts

16   there?

17   A. I don't remember if Joe was there or not.

18   I don't know. I don't remember.

19   Q. Do you remember who else was there, if

20   anybody?

21   A. No. I can't remember who all.

22   Q. When is the first time you spoke to Mr.

23   Sons after his son's death?

24   A. Just immediately after then. They were

25   here. They were there. They had been notified and

## Page 60

1    they were there.

2    Q. Tell me about that meeting.

3    A. I just introduced myself, told them who I

4    was and, you know, we talked there for a little

5    while. It was him and his wife, and I don't remember

6    if there was anyone else with him or not that day.

7    But, you know, we just talked and -- you know, that's

8    when he told me about his son being, you know, being

9    sick and he said his wife was afraid to come home

10   because his son was there and she was living in

11   Tupelo or somewhere and she wouldn't want to come

12   home because he was there. And he told me all that

13   there that day. But other than that, just general

14   conversation, you know, just talked.

15   Q. Was he cordial? Was he cordial to you?

16   A. Yeah. Uh-huh (Indicating yes).

17   Q. He wasn't disrespectful?

18   A. Oh, no. No, he wasn't.

19   Q. Anything else you remember y'all talked

20   about that day?

21   A. No, not really.

22   Q. Do you recall telling him that the jail had

23   been sued before by somebody who had committed

24   suicide?

25   A. No.

Ex. 10 to MSJ

Page 61

1    **Q.**  You don't recall that conversation?

2    **A.**  I don't remember it.  I may have.  I don't

3    remember it.

4    **Q.**  Have we talked about everything that you

5    personally did or you asked to be done as far as

6    investigation?

7    **A.**  Well, you know, I'm sure I told him what we

8    were doing as far as the investigation.  I know I

9    would have told him that.

10   **Q.**  Have you and I today talked about

11   everything that you either did personally to

12   investigate this incident or had your staff or

13   jailers do?

14   **A.**  Yes.

15   **Q.**  As I understand it, pretty much you left

16   everything up to the MBI?

17   **A.**  Yeah.

18   **Q.**  Other than removing the bunk, the top bunk

19   that was used by Mr. Sons to hang himself, has the

20   jail or sheriff's department made any changes to the

21   inside of the jail?

22   **A.**  No.

23   **Q.**  How about to policy or procedure as it

24   relates to dealing with someone who has suicidal

25   tendencies or that?

Page 62

1    **A.**  No, not that I'm aware of.

2    **Q.**  So as we sit here today, the policies are

3    just the same as they are in there before you?

4    **A.**  Yes.

5    **Q.**  Do you think that any changes should be

6    made as a result of the things you learn from suicide

7    cases like this?

8    **A.**  You could write up the biggest policy in

9    the world and you couldn't prevent it.  There's no

10   way. God knows, you know, it hurts us.  But we --

11   you know, you just -- you just -- you know yourself

12   there ain't no way to prevent it.  If they're going

13   to do it they're going to do it.  And just like in

14   this case, you know, I didn't think there was no way

15   to hang himself off a top bunk in that jail that's

16   four foot tall -- four foot off the ground and him

17   a -- I don't know what size he was, but I'm sure he

18   was 5'9" or a six-foot fellow.  I don't know.  You

19   know, you just can't prevent all of it.  And I wish

20   we could.  But a policy, that policy, you know, we go

21   by it.  But I don't know of anything that I could

22   change that would help it any.

23   **Q.**  So you brought up the word you can't

24   prevent it.  Is it your opinion that this suicide was

25   unpreventable?

Page 63

1    **A.**  Well, I'm not saying that as much as, you

2    know, what I am saying that if he's going to do it

3    they're going to do it, you know.  If I had of had a

4    man sitting there watching that monitor and seen just

5    exactly what was going on, every minute of it, yeah,

6    it could have been prevented.

7    **Q.**  What do you require of your jailers as it

8    relates to routine checks on inmates?

9    **A.**  Well, they watch the monitors.  And then if

10   the inmates need anything back there they'll bump the

11   door or something and the jailer will check on them,

12   you know, at that time.

13   **Q.**  Do you have any policy or procedure that

14   sets forth, or any mandate from you to your jailers

15   that sets forth how often they should be doing

16   physical checks of the cells?

17            **MR. HILL:**  Are you talking about

18   suicide or just anybody?

19            **MR. STROUD:**  Well, let's start with --

20   let's start with suicides, suicide risk patients or

21   inmates.

22   **Q.**  (Mr. Stroud)  Let me re-ask the question.

23   For suicide, people with suicide risks, okay, people

24   that are there on mental commitments or people that

25   are there that have a known suicide risk, do you

Page 64

1    require that your jail do physical checks, not just

2    look at the monitor, but do physical checks?

3    **A.**  Yes.

4    **Q.**  What do you require?

5    **A.**  Well, like on an attempted suicide, if we

6    know they're suicidal, what I mean, attempted suicide

7    or anything, then they're required to sign that

8    sheet, to look in that door and sign that sheet.

9    I've got a sheet up there they sign every 15 minutes,

10   you know, and date it, time it and all.

11   **Q.**  As I understand it reading the policy, you

12   correct me if I'm wrong, that's only for people who

13   have actually attempted suicide within the jail,

14   correct?

15   **A.**  Well, you know, yes, something, suspected

16   suicide, attempted suicide, you know, along that case

17   then they're supposed to do that.

18   **Q.**  So if someone actually attempts to commit

19   suicide and they're stopped by a jailer, then they go

20   on to suicide watch, right?

21   **A.**  Yeah.

22   **Q.**  And that requires 15-minute physical

23   checks, right?

24   **A.**  Yeah.

25   **Q.**  But if someone comes into the jail on a

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

---

Page 65

1   mental commitment, then they're not necessarily on
2   suicide watch like that, are they?
3       A.  Not necessarily.
4       Q.  Okay.  And if somebody comes into the jail
5   on a mental commitment and they have had suicidal
6   tendencies in the past, they're not necessarily on
7   that suicide watch we recommended?
8       A.  No.
9       Q.  It actually takes having them attempt
10  suicide within the jail to get on that, right?
11      A.  Well, yeah.
12      Q.  You mentioned that jailers will sometimes
13  go to check on them when they're either --
14      A.  Yeah.
15      Q.  -- beating on the door or knocking on the
16  door?
17      A.  Yeah.
18      Q.  Is that -- that something that is
19  discouraged, for inmates to knock on the door?
20      A.  No.
21      Q.  If an inmates needs something you expect
22  them to let you know, right?
23      A.  Yeah.
24      Q.  When you heard that Mr. Sons had hung
25  himself in the jail and it had not been seen by

---

Page 66

1   Mr. Stanton or by the dispatcher -- in fact, do you
2   know that as we sit here today, Sheriff, that he had
3   been -- he had hung himself and been in that
4   condition for almost an hour before he was
5   discovered?
6       A.  I didn't know it.  I know now but I didn't
7   at that time.
8       Q.  You've learned that since then, right?
9       A.  Yes.
10      Q.  Knowing the fact that a mental commitment
11  inmate is there and that there's an opportunity to
12  monitor his actions live by either the dispatcher or
13  the jailer, does it outrage you at all that someone
14  could hang themself in the cell under that
15  supervision and be that way for almost an hour?
16          MR. HILL:  Object to the form of the
17  question.  Argumentative.  You can answer.
18      A.  Yes, it does to a -- you know, it --
19      Q.  (Mr. Stroud)  Any other conversations you
20  had with the family other than that initial one where
21  they came to the jail and learned that their son had
22  died?
23      A.  No.  I seen Mr. Sons one time shortly after
24  then at the store and spoke to him briefly, but
25  that's all.

---

Page 67

1       Q.  Did y'all discuss this at all?
2       A.  I don't remember.  I was coming out of the
3   store and he was going in or he was coming out and I
4   was going in and I just spoke with him just for a --
5           MR. STROUD:  Let's mark this as
6   Exhibit 2.
7           (Exhibit No. 2 -- Letter from Philip
8   Stroud to A. A. McMullen, dated 9-22-15 -- marked and
9   may be found attached to the transcript.)
10      Q.  (Mr. Stroud)  I show you what I've marked
11  as Exhibit 2.  Do you see that?
12      A.  Yeah, I've seen it.
13      Q.  What are you holding?  What is that?
14      A.  It's just where you wrote us that you were
15  going to represent Mr. Sons.
16      Q.  Did you receive that letter on or about
17  September 22nd, 2015?
18      A.  I don't know.
19      Q.  Do you ever recall receiving that letter
20  several days after this suicide?
21      A.  I'm not sure if I remember it or not.  I
22  don't know.
23      Q.  Is the fax number to the jail 662-224-6307?
24      A.  Yes, sir.
25      Q.  When is the first time you recall actually

---

Page 68

1   seeing this letter?
2       A.  I don't know.  This is not one that I got
3   when I got served with all these papers.
4       Q.  This would have been on September 22nd,
5   2015.  If you remember, fine.  If you don't, fine.
6       A.  I don't remember.
7       Q.  Have you since read this letter?
8       A.  I just read over what we got when we got
9   the papers that this lawsuit had been filed.
10      Q.  I'm going to represent to you this letter,
11  and it speaks for itself, but this letter asks you to
12  preserve all video --
13      A.  Yeah.
14      Q.  -- within the jail.  And I think you've
15  already told me you didn't take steps to preserve any
16  video unless the MBI requested it, right?
17      A.  They're the ones that took the case, yeah,
18  they took it for me.  I'm sure they got all the video
19  of that.
20      Q.  You didn't -- again, you didn't
21  specifically instruct anyone to preserve video?
22      A.  No.
23      Q.  So what video they did preserve and what
24  video they taped over or erased you have no idea?
25      A.  No.

---

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

18

## Page 69

1     **Q.** Okay. And you said you had never seen any

2 video of Mr. Sons actually hanging himself. But have

3 you seen any other video for September 18th or 19th

4 within the jail?

5     **A.** No.

6     **Q.** Okay. Who's the person that is in charge

7 of downloading video and preserving it or burning it

8 onto a disc?

9     **A.** I don't know if we do that or not. I don't

10 know.

11     **Q.** Who would know within your department?

12     **A.** Deputy Batts would know.

13         **MR. STROUD:** All right. Let's go off

14 the record real quick.

15         **THE VIDEOGRAPHER:** We're off the

16 record at 11:50.

17         (Pause in proceedings.)

18         **THE VIDEOGRAPHER:** We're back on

19 record at 11:51.

20         **MR. STROUD:** No further questions.

21         EXAMINATION

22 **BY MR. HILL:**

23     **Q.** Arnie, I just have a few questions. Is it

24 the policy at the Benton County jail for all mental

25 commitment inmates to be continuously monitored on

## Page 70

1 24-hour live video?

2     **A.** Yes.

3     **Q.** And is the jailer the person responsible

4 for keeping an eye on that mental commitment over the

5 video?

6     **A.** Yes.

7     **Q.** And when that person, jailer is moving

8 around, whose responsibility is it to watch the

9 video?

10     **A.** Well, we've got the monitor in the dispatch

11 office, they watch it as much as possible too.

12     **Q.** Okay. My understanding is you've never

13 seen the video of him hanging himself.

14     **A.** No.

15     **Q.** So you don't know why he was allowed to sit

16 there on the floor for an hour or so before he was

17 cut down?

18     **A.** I've never seen it.

19     **Q.** So you don't know why he was allowed to do

20 that?

21     **A.** No.

22         **MR. HILL:** I don't have any other

23 questions.

24         **MR. STROUD:** No questions.

25         **THE VIDEOGRAPHER:** All right. That

## Page 71

1 concludes the videotaped testimony of Sheriff Arnie

2 McMullen. We're off the record at 11:52, one DVD.

## Page 72

1       C E R T I F I C A T E

2 STATE OF MISSISSIPPI   )

3 COUNTY OF LEE       )

4 RE: VIDEOTAPED DEPOSITION OF A. A. "ARNIE" McMULLEN

5     I, Regina D. Russell, RPR, CCR 1110, a Notary

6 Public within and for the aforesaid county and state,

7 duly commissioned and acting, hereby certify that the

8 foregoing proceedings were taken before me at the

9 time and place set forth above; that the statements

10 were written by me in machine shorthand; that the

11 statements were thereafter transcribed by me, or

12 under my direct supervision, by means of

13 computer-aided transcription, constituting a true and

14 correct transcription of the proceedings; and that

15 the witness was by me duly sworn to testify to the

16 truth and nothing but the truth in this cause.

17     I further certify that I am not a relative or

18 employee of any of the parties, or of counsel, nor am

19 I financially or otherwise interested in the outcome

20 of this action.

21     Witness my hand and seal on this 28th day of

22 December, 2016.

23

24

    My Commission Expires: CCR 1110

25 January 27, 2020    Notary Public

Deposition of A. A. "Arnie" McMullen, taken December 7, 2016

19

Page 73

1      IN THE UNITED STATES DISTRICT COURT FOR THE
           NORTHERN DISTRICT OF MISSISSIPPI
2               OXFORD DIVISION
3    JAMES LEE SONS, individually and
     on behalf of the wrongful death
4    beneficiaries of JAMES ALLEN
     PARKS SONS, deceased          PLAINTIFFS
5
     VS.          NO. 3:16-CV-181-MPM-RP
6
     BENTON COUNTY, MISSISSIPPI, ET AL   DEFENDANTS
7
8               CERTIFICATE
9      I, A. A. "ARNIE" McMULLEN, have read the
10   foregoing pages, 1-70, of the transcript of my
11   deposition given on December 7, 2016, and it is true,
12   correct and complete to the best of my knowledge,
13   recollection and belief except for the list of
14   corrections, if any, attached on a separate sheet
15   herewith.  Witness my hand, this the _____ day
16   of _____, 2016.
17

18           _____
             A. A. "ARNIE" McMULLEN
19               CERTIFICATE
20     Subscribed and sworn to before me, this the
21   _____ day of _____,
22   2016.

23           _____
             Notary Public in and for the
             County of _____
24   My Commission        State of Mississippi
     Expires: _____
25

Page 74

1           ADVANCED COURT REPORTING
                 P.O. BOX 761
2           TUPELO, MISSISSIPPI 38802-0761
3
            CORRECTION LIST
4
     JAMES LEE SONS, individually and
5    on behalf of the wrongful death
     beneficiaries of JAMES ALLEN
6    PARKS SONS, deceased          PLAINTIFFS
     VS.
7    BENTON COUNTY, MISSISSIPPI, ET AL   DEFENDANTS
8    Federal - No. 3:16-CV-181-MPM-RP

9    CAPTION
10   DECEMBER 7, 2016      A. A. "ARNIE" McMULLEN

11   DATE OF DEPOSITION          DEPONENT'S NAME
12   PAGE LINE  CORRECTION          REASON
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24
25        _____
             A. A. "ARNIE" McMULLEN

Ex. 10 to MSJ