IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**JAMES LEE SONS, individually, and on
behalf of the wrongful death beneficiaries
of JAMES ALLEN PARKS SONS, deceased**                                **PLAINTIFF**

**VS.**                                **CIVIL ACTION NO. 3:16 –CV-181-MPM-RP**

**BENTON COUNTY, MISSISSIPPI, ET AL.**                                **DEFENDANTS**

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### <u>INTRODUCTION</u>

       James Allen Parks Sons ("Sons") committed suicide at the Benton County Jail ("Jail") in Ashland, Mississippi on September 19, 2015. At the time of his death, Sons was being held at the Jail pending a psychiatric evaluation pursuant to <u>Miss.</u> <u>Code</u> <u>Ann.</u> §41-21-67.

       His father, James Lee Sons ("Plaintiff"), alleges that Benton County, Mississippi ("Benton County"), Sheriff A.A. McMullen, ("Sheriff McMullen") Chief Deputy Joe Batts ("Deputy Batts"), and Jailor Johnny Stanton ("Jailor Stanton") (collectively "Defendants") are liable for Sons' death. Specifically, the Plaintiff alleges that the Defendants violated Sons' *Fourteenth Amendment* rights under the United States Constitution.

       Sons committed suicide by tearing his bed sheet, tying it through a hole in a wooden bunk frame that was approximately fifty-two (52) inches off the floor, making it into a ligature, and sitting down almost on the floor. At the time of his death, Sons was under continuous twenty-four (24) hour, closed circuit, video surveillance by jail staff pursuant to jail policy. The video of the suicide establishes that it took approximately six to seven (6-7) minutes from the time Sons first began manipulating the bedsheet until the time his body stopped convulsing. (See video of suicide, attached to Motion for Summary Judgment as Exhibit 1).

Sons waited until lunch time when Jailor Stanton, whose responsibility it was to monitor Sons on the closed circuit video feed from his desk at the jail, was assisting jail trusties in serving lunch.[1] During this approximate one (1) hour period, the responsibility of monitoring Sons was left to dispatcher, Missy Campbell,[2] who failed to alert Jailor Stanton to Sons' actions. As a result, Sons was not discovered in his cell until a jail trusty, James Beeler, came by to collect his food tray and noticed Sons sitting motionless with his sheet tied around his neck.

Although Sons death is tragic, the actions of the individual Defendants in this case do not rise to the level of "deliberate indifference;" and as such, Sheriff McMullen, Deputy Batts, and Jailor Stanton are all entitled to qualified immunity. Sheriff McMullen is also entitled to qualified immunity since the Plaintiff did not have a "clearly established" right to the implementation of adequate suicide prevention policies under the United States Supreme Court's recent decision in Taylor v. Barkes, 135 S. Ct. 2042 (2015).

As for the claim against Benton County, the Plaintiff is incapable of establishing that a policy or custom at the Jail was the "moving force" behind Sons' suicide. The policy for monitoring all "mental commitments" at the jail is identical to the policy applicable to prisoners who are suspected of being suicidal: these individuals are isolated in a separate cell known as the "Juvenile cell" or "J cell" and monitored continuously by video surveillance. Prior to Sons death, the "J cell" was modified to remove any obvious tie off points. In fact, there is no evidence in this case that jail staff were aware that someone could commit suicide in the manner in which Sons committed suicide. Consequently, Benton County is also entitled to summary judgment and to a dismissal of the Plaintiff's claims with prejudice.

---

[1] Only one (1) jailor and one dispatcher is on duty at any one time at the Jail.

[2] Missy Campbell is not a defendant in this case. Campbell died of a heart attack in July of 2016. Her statement was never taken by the MBI investigator assigned to investigate the death.

**FACTS**

A. **September 18, 2015.**

On September 18, 2015, the Plaintiff drove to the Benton County Sheriff's Department in Ashland, Mississippi and spoke with Deputy Batts. The Plaintiff told Deputy Batts that he was concerned that Sons posed a danger to himself and others. (See deposition of Joe Batts, p. 5-6, attached to Motion for Summary Judgment as Exhibit 2).

Deputy Batts told the Plaintiff that he could go to the Benton County Chancery Court and seek a Court order, authorizing the Sheriff's Department to hold Sons at the jail pending a mental evaluation. Id.

The Plaintiff then went to the Benton County Chancery's Clerk Office and completed a "Uniform Commitment Affidavit" pursuant to Miss. Code Ann. § 41-21-65. (See Affidavit, attached to Motion for Summary Judgment as Exhibit 3). The Chancery Court, through a special master, then issued a "Writ to Take Custody" of Sons and ordered him held at the Jail pending a psychiatric evaluation. (See Writ, attached to Motion for Summary Judgment as Exhibit 4).[3]

The Plaintiff then drove his son to the Jail. Upon arrival at the Jail, Deputy Batts explained to Sons that he was being detained pending a psychiatric evaluation. According to Batts, Sons reaction was as follows:

> Well, he was pretty distressed, you know, about being taken into custody. He was saying he didn't need an evaluation. And so we talked, you know, for several minutes and I tried to assure him that the process, you know, would be handled as speedily as possible and the end results with him being back home with his folks. When I explained that the best I could, I told him, you know, what we're going to have to do now is take you back

---

[3] Chancery Court staff informed Betts that Sons' mental evaluation was scheduled for Tuesday, September 22, 2015, in Tupelo, MS. (See hand written note from jail file noting appointment, attached to the Motion for Summary Judgment ad Exhibit 5). This meant that Sons would be at the jail for four (4) days.

3

and book you for the, you know, for the stay. And he became very anxious about being out in a cell. Asked that he – you know, he did not want to go into a cell.

And so at that point, you know, I'm trying to keep him as calm as possible. I said, well, you know, instead of locking you into a cell, I'll let you stay in what we call our C cell, which is our trustee area, which has several other people. Him being put there meant that, you know, he could have someone else to talk to, play cards, et cetera. And that calmed him down. (Ex. 2, p. 14-15).

Deputy Batt's decision to place Sons initially in an open bay cell, due to his anxiety of being placed in a locked cell, is an admitted deviation from jail policy, which required that mental commitments be isolated in the "J cell." (Exhibit 2, p. 33).[4]

Sons was booked into the Jail by Jailer Stanton on September 18, 2015 at approximately 1:54 p.m. (See Booking Sheet, attached to Motion for Summary Judgment as Exhibit 6).[5] In regard to monitoring Sons, Batts instructed the jail staff as follows:

I told the other members of the sheriff's department, you know, that, you know, he was a mental commitment, that we had received information that he could harm himself, you know, and that we needed to, you know, watch him closely. (Ex. 2, p. 22-23)

At his deposition, Jailor Stanton confirmed that Batts told him that Sons was a mental commitment, that he had problems, and that he was to be monitored continuously. (See Deposition of Johnny Stanton, p. 6-8, attached to Motion for Summary Judgment as Exhibit 7).

While it is true that Deputy Batts never used the term "suicide risk" and did not place Sons on "suicide watch," this is a distinction without a difference since mental commitments, regardless of whether they are suicidal, are treated the same under jail policy. According to Deputy Batts, there is no difference in the policy between monitoring a mental commitment and

---

[4] This deviation from jail policy has no bearing on this case, because Sons moved to the "J cell" later that evening. The "J Cell" is a single cell with no bars. It has a window and metal tray slot.

[5] The medical screening sheet that Jailor Stanton completed during the booking process noted that Sons suffered from mental illness. (Ex. 6).

4

placing an individual on "suicide watch." (Exhibit 2, p. 49-50). All are placed in the "J cell" and continuously monitored by video.[6]

At approximately 10:30 on September 18, 2015, Sons told the second shift Jailer, Willie Brown, that he was "nervous." Therefore, Jailer Brown moved Sons to the "J cell," which could be observed continuously by closed circuit video from the monitors on both the jailer's desk and dispatcher's desk. Placing Sons in the "J cell" and monitoring him continuously *via* video was done in accordance with Jail policy. (Ex. 2, p. 33). The night passed without incident.

B. **September 19, 2015.**

On the morning of the 19th, Sons ate breakfast and all appeared to be fine. It is undisputed that prior to his suicide, Sons gave no indication to jail staff or fellow prisoners, either orally or by his actions, that he was contemplating suicide.

At approximately 11:28 a.m., according to the time stamp on the video, Sons went to the window of his cell and looked out. One of the trusties, a prisoner named Donnie Richmond, saw Sons looking out of the window. At that time, Richmond and fellow trusty Beeler, who had been outside washing one of the patrol cars, had just reentered the Jail at the instructions of Jailor Stanton to begin the lunch service process. (See deposition of Donnie Richmond, p. 8, attached to Motion for Summary Judgment as Exhibit 8). This is an important fact in this case. The times given by the trusties and Jailor Stanton in their written statements in this case are clearly estimated times. The time stamp on the video conclusively establishes that the trusties and Stanton began the process of serving lunch at 11:28 am. Jailor Stanton stated in his deposition that his statements regarding exact times were an estimate, and that he would defer to the video

---

[6] The policy for observation and protection of mental commitments is not a written policy, rather it is a custom or practice implemented at the jail. There is a written policy at the Jail entitled "Suicide and Attempt Suicide." However, this policy only applies to situations where an inmate commits suicide or attempts to commit suicide while at the Jail.

5

for the actual times. (Ex. 7, p. 51-21). This means that Stanton would not have been at his desk in a position to observe Sons on the video monitor during the six or seven (7) minutes it took for Sons to kill himself. (Exhibit 1). The responsibility of monitoring Sons at this time belonged to the dispatcher on duty, Missy Campbell.

Sons began making preparations to commit suicide around 11:30 am. (Exhibit 1). He tore his bed sheet, ran it through a hole in a wooden bunk frame that was approximately fifty-two (52) inches off the floor, made it into a ligature, and lowered himself down towards the floor. Through sheer strength and determination, Sons was able to keep most of his lower body off the floor, which meant that the ligature around his neck held all of his body weight. (Ex. 1).

At approximately 12:26, trusty Beeler noted that Sons had not picked up his lunch from the tray slot. Beeler peered into the cell and saw Sons hanging motionless. Beeler alerted Jailor Stanton, who immediately tried to free Sons but was unable to. Beeler used a knife to cut the ligature and Sons' body was placed on the cell floor. An investigator with the Sheriff's Department, Pete Samples, entered the cell and determined that Sons had no pulse. (Ex. 1) (See also Deposition of James Beeler, p. 6-10, attached to the Motion for Summary Judgment as Ex. 9).

Pursuant to jail policy, the Sheriff's Department immediately notified the Mississippi Bureau of Investigation of the death, who conducted the investigation into the suicide. (See Deposition of Sheriff McMullen, p. 35, attached to Motion for Summary Judgment as Exhibit 10.).

    **C.**    **The Role of Sheriff McMullen**

Sheriff McMullen is the policymaker for Benton County related to jail policies, and he implemented the polices that are at issue in this case. It is the policy of the Benton County

Sheriff's department to place all "mental commitments" in the "J Cell" and continuously monitor them using 24 hour video surveillance. The jailor on duty is responsible for monitoring the prisoner. When he is attending to other duties, the dispatcher is required to monitor the video feed. (Ex. 10, p. 69-70).

There is no evidence in this case that Sheriff McMullen was aware that this policy was somehow deficient. In fact, the policy saved the life of an individual who tried to hang himself from bars that were formally in the "J cell." (Ex. 10, p. 14). Those bars were removed prior to Sons' time at the Jail. In fact, there is no evidence in this case that any Sheriff's Department employee even knew that someone could hang themselves in the manner in which Sons committed suicide.

The policy at issue did not require that mental commitments or suicidal prisoners placed in the "J Cell" be denied a blanket or sheet. However, there is no evidence that any individual in the "J Cell" had attempted to commit suicide in the manner in which Sons committed suicide or use a tie off point that was only 52 inches off the ground.

There is also no evidence that Sheriff McMullen failed to adequately train his jailors. All of the jailors go to "jailors school" and are certified. (Ex 10, p. 17).

## STANDARD OF REVIEW

The standard of review in relation to the claims brought against Benton County is the usual standard applied to motions brought under F.R.C.P. 56. A party seeking summary judgment bears the initial burden of informing the court of the basis of the motion and identifying those portions of the pleadings, depositions, answers to interrogatories and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). QBE Ins. Corp. v. Brown & Mitchell, Inc., 591 F.3d

439, 442 (5th Cir. 2009). A fact is material only if its resolution would affect the outcome of the action…." Wiley v. State Farm Fire and Cas. Company, 585 F.3d 206, 210 (5th Cir. 2009). "Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Boyle v. Allstate Ins. Co., 615 F.3d 350, 355 (5th Cir. 2010).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials of the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. Celotex Corp., 477 U.S. at 322; Boyle, 615 F.3d at 355; Smith ex rel. Estate of Smith v. United States, 391 F.3d 621, 625 (5th Cir. 2004). The nonmovant's burden is not satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, by speculation, by the mere existence of some alleged factual dispute, or by only a scintilla of evidence." Boudreau, 402 F.3d at 540. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. Nebraska v. Wyoming, 507 U.S. 584, 590 (1993); Celotex Corp., 477 U.S. at 322; Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). "Where the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." Apache Corp. v. W & T Offshore, Inc., 66 F.3d 789, 793 (5th Cir. 2010).

The standard applicable to analyzing the defense of qualified immunity, however, is different. The Fifth Circuit has consistently acknowledged that the assertion of the qualified immunity defense "alters the usual summary judgment burden of proof." Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005). Thus, once an official pleads the defense, the burden shifts to the plaintiff who must rebut the defense by establishing a genuine issue of fact as to whether the official's allegedly wrongful conduct violated clearly established law. Michalik, 422 F.3d at 252. The plaintiff must provide evidence that will support a favorable jury verdict. See Bazan v. Hidalgo County, Texas, 246 F.3d 481, 489 (5th Cir. 2001).

While absolute proof is not required, "conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." Oliver v. Scott, 276 F.3d 736, 744 (5th Cir. 2002); see also Ontiveros v. City of Rosenburg, Texas, 564 F.3d 379, 382 (5th Cir. 2009).

## **ARGUMENT**

The Plaintiff's claims are brought pursuant to 42 U.S.C. Section 1983, which creates a private right of action for redressing the violation of federal constitutional rights by those acting under color of state law. See Goodman v. Harris County, 571 F.3d 388, 394 (5th Cir. 2009).[7]

In order for the Plaintiff to create a triable jury issue, he must first show that the Defendants deprived Sons of a constitutional right. Oliver v. Scott, 276 F.3d 736, 744 n. 10 (5th Cir. 2002). "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." Victoria W. v. Larpenter, 369 F.3d

---

[7] Section 1983 is not itself a source of substantive rights "but merely provides a method for vindicating federal rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266, 271 (1994); Sepulvado v. Jindal, 729 F.3d 413, 420 n.17 (5th Cir. 2013).

9

475, 482 (5th Cir. 2004). Next, the Plaintiff must prove that the alleged Constitutional deprivation was "intentional" or due to "deliberate indifference" – not the result of mere negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994).

In this case, the Plaintiff alleges that the Defendants violated Sons' *Fourteenth Amendment* right by failing to appropriately monitor him while he was at the Jail. The Plaintiff further alleges that individual Defendant, Sheriff McMullen, may be held individually liable for failing to adopt sufficient policies for the monitoring of suicidal prisoners, and for failing to hire and/or appropriately train jail staff in suicide prevention. Finally, the Plaintiff seeks to hold Benton County liable for the actions of its policymaker, Sheriff McMullen, for the adoption of unconstitutional suicide watch polices, which the Plaintiff alleges caused Sons death. As will be shown in great detail below, the Defendants are entitled to summary judgment on each of these claims.[8]

### A. The individual Defendants are entitled to qualified immunity.

As this Court is well aware, the qualified immunity defense under 42 U.S.C. §1983 is designed to protect government employees from civil liability as long as the official's conduct does not violate the clearly established Constitutional rights of which a reasonable person would have known. Wernecke v. Garcia, 591 F.3d 386, 392 (5th Cir. 2009).

The Fifth Circuit applies a two-step analysis to determine whether a defendant is entitled to qualified immunity. Ramirez v. Knoulton, 542 F.3d 124, 128 (5th Cir. 2008). First, the Court is to determine whether evidence exists that the individual defendant violated the plaintiff's Constitutional rights. Second, if sufficient evidence of a Constitutional violation is found within

---

[8] All of the Plaintiff's allegations relate to alleged acts or omissions which occurred before jail staff discovered that Sons had committed suicide. The Plaintiff does not allege in his Complaint that the actions of Jailor Stanton or other jail staff violated Sons' constitutional rights when they removed the ligature from his neck, laid him on the floor, and confirmed that he did not have a pulse.

the record, the Court next considers whether the defendant's actions "were objectively unreasonable in light of clearly established law at the time of the conduct in question." Freeman v. Gore, 483 F.3d 404, 411 (5th Cir. 2007); see also Thompson v. Upshur County, Texas, 245 F.3d 447, 456 (5th Cir. 2001). A defendant's actions are deemed to be "objectively reasonable" unless all reasonable officials in the defendant's circumstances would have known that the conduct at issue violated clearly established law. Thompson, 245 F.3d at 457.

**Step 1- No Constitutional violation occurred.**

The Plaintiff alleges that the individual Defendants violated Sons' *Fourteenth Amendment* rights, as a pretrial detainee, by failing to provide a minimally adequate level of medical care for his serious medical needs. Pretrial detainees have a constitutional right, under the Due Process Clause of the *Fourteenth Amendment*, to adequate medical care and protection from harm during the length of their confinement. *See* Thompson v. Upshur Cnty., Tex.*,* 245 F.3d 447, 457 (5th Cir. 2001); Jacobs v. West Feliciana Sheriff's Dep't*,* 228 F.3d 388, 393 (5th Cir. 2000).

In Hare v. City of Corinth, the Fifth Circuit adopted the subjective deliberate indifference test to determine when the episodic acts or omissions of a governmental employee violate a pretrial detainee's right to medical care and protection from harm under the *Fourteenth Amendment*. Hare v. City of Corinth, 74 F.3d 633, 647-48 (5th Cir. 1996).

To prove a violation of the *Fourteenth Amendment* under the subjective deliberate indifference test, a plaintiff must establish two elements: (1) that the defendant had subjective knowledge of a substantial and serious risk that the pretrial detainee might commit suicide; and (2) that the defendant nevertheless disregarded the risk of suicide by responding to it with deliberate indifference. Id. In other words, "the official must both be aware of facts from which

11

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference," yet still disregard the risk of suicide. Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Regardless of what the individual Defendants subjectively knew or did not know about Sons' mental state or risk of suicide, there is not sufficient evidence in this case to establish that the individual Defendants acted with deliberate indifference. To prove that the individual defendants responded to the risk of suicide with deliberate indifference, the Plaintiff must establish more than mere negligence or a lack of oversight. Hare v. City of Corinth, Miss., 74 F.3d 633, 646 (5th Cir. 1996). "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscious of mankind." McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997).

While it is true that Deputy Batts deviated from jail policy by allowing Sons to be initially placed in an open cell as opposed to the "J Cell," this is not evidence of deliberate indifference. Deputy Batts explained that he did this because Sons was anxious about going to a locked cell and therefore he allowed him to go to the open bay in order to relax him. This shows great concern for Sons' well-being. Regardless, it cannot be said that initially deviating from the policy was the proximate cause of Sons' death. Sons did not commit suicide in the open bay cell, but rather in the "J Cell," which he was transferred to on the evening of the 18th.

As for Jailor Stanton, his actions do not evidence deliberate indifference. He followed the jail policy, which was to continuously monitor Sons *via* video surveillance. There is no evidence that he failed to appropriately monitor Sons. In fact, the testimony in this case establishes that he was not at his desk when Sons committed suicide, but rather was assisting the jail trusties in performing the lunch service.

As for Sheriff McMullen, he never met Sons or the Plaintiff until after Sons had committed suicide. Consequently, the Plaintiff's claim against Sheriff McMullen, individually, is related to his adoption and implementation of jail policies that the Plaintiff alleges are constitutionally deficient.

It is true that Sheriff McMullen, as the official policy maker for the Jail, may be held liable if he "implemented a policy so deficient that the policy itself is a repudiation of Constitutional rights and is the moving force of the Constitutional violation." Callahan, 623 F.3d at 256-57. However, the existence of a Constitutionally deficient policy cannot be inferred from a single wrongful act. Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987). There has to be proof that McMullen knew that the policy in place was deficient because it had failed to protect other mental commitments. Again, there is no evidence that other inmates had attempted to harm themselves in the same manner.

**Step 2- The actions of the Defendants were objectively reasonable in light of clearly established law.**

If this Court determines that sufficient evidence of a constitutional violation exists, it must then determine whether the individual Defendants' actions or omissions were nonetheless objectively reasonable in light of the clearly established law at the time of Sons' suicide. Freeman v. Gore, 483 F.3d 404, 410-11 (5th Cir. 2007).

At this stage of the qualified immunity analysis, the Court asks whether the law lacked such clarity that it would be objectively reasonable for an officer to erroneously believe that his conduct was not deliberately indifferent to the substantial risk of suicide. See Lytle v. Bexar Cnty., Tex., 560 F.3d 404, 410 (5th Cir. 2009). This second step requires two distinct inquiries: (1) what was the clearly established law at the time of Sons' suicide; and (2) were the individual

13

Defendant's actions objectively unreasonable in light of that clearly established law? See Hare v. City of Corinth, Miss., 135 F.3d 320, 326 (5th Cir. 1998).

To be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987).

As to the claims against Deputy Batts and Jailor Stanton, it was well established at the time of Sons' suicide that pre-trial detainees had a right under the *Fourteenth Amendment* not to have their serious medical needs met with deliberate indifference. Jacobs v. West Feliciana Sheriff's Dep't, 228 F.3d 388, 393-94 (5th Cir. 2000).

However, in relation to the claims against Sheriff McMullen, it was not well established at the time of Sons death that pre-trial detainees have a constitutional right to the adoption of adequate suicide prevention protocols. In fact, the United States Supreme Court expressly held on June 1, 2015 in the case of Taylor v. Barkes that jail officials were entitled to qualified immunity for Section 1983 claims alleging insufficient suicide prevention protocols. The Court, stated that "[N]o decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols." Taylor. Barkes, 135 S. Ct. 2042, 2043 (2015). Since the Plaintiff can point to no cases from the Fifth Circuit or the United States Supreme Court which would clearly establish a constitutional right to sufficient suicide prevention policies, Sheriff McMullen is clearly entitled to qualified immunity.

The next inquiry is whether the conduct was objectively reasonable in light of clearly established law. Hare v. City of Corinth, Miss., 135 F.3d 320, 327 (5th Cir. 1998). The actions of the individual Defendants will be considered objectively reasonable unless "all reasonable

officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution." Thompson, 245 F.3d at 457 (emphasis in original).

Based on the record in this case, it cannot be said that all reasonable jail employees would have acted differently under the circumstances. The Plaintiffs are basically alleging that despite the policy in place that allowed mental commitments and those at risk for suicide to be isolated in the "J Cell," given a bed sheet, and monitored continuously by 24 hour video surveillance, the individual defendants should have done more to protect Sons. Most, if not all jailors, follow the policies implemented by their Sheriff. There is no evidence that the individual defendants knew that the policy was somehow inadequate and that they would therefore need to do more to protect Sons. For these reasons, the conduct of the individual Defendants was objectively reasonable.

     **B.**    **The Claims against Benton County are subject to dismissal.**

When a Section 1983 suit is brought against a local governmental entity, a plaintiff must show that: (1) a policy or custom existed, (2) the governmental policy makers actually or constructively knew of its existence, (3) a constitutional violation occurred, (4) and the custom or policy served as the moving force behind the violation." Meadowbriar Home for Children, Inc. v. Gunn, 81 F.3d 521, 533 (5th Cir. 1996); see also Bustos v. Martini Club, Inc., 599 F.3d 458, 467 (5th Cir. 2010). "The unconstitutional conduct must be directly attributable to the municipality [or County] through some sort of official action or imprimatur." Piotrowski v. city of Houston, 237 F.3d 567, 578 (5th Cir. 2001).

A governmental entity may not be held liable for the acts of its employees under a theory of *respondeat superior*. Monell v. Department of Social Services, 436 U.S. 658, 694 (1978).

The requisite proof of "culpability" on the part of the local governmental entity requires that a plaintiff demonstrate that the municipal decision or policy at issue reflects "deliberate indifference to the risk that a violation of a particular constitutional right will follow the decision. Bryan County, 520 US at 411. Moreover, with regard to proximate causation, the governmental entity does not incur liability under Section 1983 unless there exists "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, 49 U.S. at 383; see also Piotrowski, 237 F.3d at 580.

In Bryan County, the Supreme Court explained that "it is not enough for a Section 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between a municipal action and the deprivation of federal rights." Bryan County, 520 U.S. at 404.

Obviously, the Plaintiff takes issue with the policy at the Jail regarding the monitoring of mental commitments. However, as demonstrated above, no constitutional violation occurred in this case, because there is no evidence of deliberate indifferences. Moreover, there is no causal connection between the alleged deficient policy and the suicide. Sons' suicidal preparations were easily viewable on the video screen. The individual assigned to monitor the video simply missed it.

Furthermore, the lack of a policy requiring face to face, periodic checks would have made no difference in this case, since Sons' suicide took only six to seven (6-7) minutes. The only other reasonable observational method that could have possibly prevented the suicide was constant video monitoring, and that method was in place.

## **CONCLUSION**

For the above reasons, the Defendants are entitled to summary judgment. They respectfully request that the Court dismiss the Plaintiff's claims with prejudice.

Respectfully submitted, this the 19th day of May, 2017.

>CLAYTON O'DONNELL, PLLC
>1300 Access Road, Suite 200
>P.O. Drawer 676
>Oxford, MS  38655
>Telephone:  (662) 234-0900
>Facsimile:  (662) 234-3557
>
>*s/ S. Ray Hill, III*
>**S. RAY HILL, III, MSB# 100088**
>rhill@claytonodonnell.com

**CERTIFICATE OF SERVICE**

I, S. Ray Hill, III, hereby certify that on May 19, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*s/ S. Ray Hill, III*
**S. RAY HILL, III, MSB# 100088**
