**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**JAMES LEE SONS, individually and
on behalf of the wrongful death beneficiaries
of JAMES ALLEN PARKS SONS, deceased**      **PLAINTIFFS**

**VS.**      **CIVIL ACTION NO. 3:16-CV-181-MPM-RP**

**BENTON COUNTY, MISSISSIPPI, ET AL.**      **DEFENDANTS**

---

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff files this memorandum supporting his response to Defendants' motion for summary judgment, and states as follows:

### I.  Facts

Jimmy Parks Sons was committed to the custody of the Benton County Jail while awaiting admission to a mental health facility.  While in the custody of the jail, Jimmy committed suicide by hanging himself with a blanket.  Jimmy's father has brought this suit under 42 U.S.C. § 1983 alleging that Benton County officials, the named defendants, were deliberately indifferent to Jimmy's right to be protected from self-harm while in the custody of the jail. While the basic facts of this case are largely undisputed, the devil is in the details, and there are genuinely disputed material facts which make summary judgment inappropriate.

A.      *How Jimmy came to be in the jail:*

On September 18, 2015, James Lee Sons, Plaintiff in this cause, went to the Benton County Sheriff's Department out of concern for his son, Jimmy.[1]  Sons spoke with Chief Deputy

---

[1] Exhibit A, Excerpts of deposition of Joe Batts, p. 16; Exhibit B, Jail incident report.

Joe Batts about his concerns for his son.[2]  According to Batts, Sons was "very worried about his son killing himself."[3]  Batts was informed that Sons had found Jimmy with a loaded shotgun in his mouth, and that Sons was able to talk Jimmy out of killing himself.[4]

Obviously recognizing the concern and the risk that Jimmy posed to himself, Batts explained to Sons that he could have Jimmy civilly committed through the chancery clerk's office.[5]  Batts even called the chancery clerk's office to explain the situation before sending Sons to the chancery clerk's office to complete the process.[6]  After speaking with Batts, Sons went to the chancery clerk's office to execute a writ for Benton County to take custody of Jimmy.[7]

Once Batts received the writ from the chancery clerk, he called Jimmy and had Jimmy come to the sheriff's department under the pretense that there was a report for Jimmy to sign regarding a gun that Jimmy had reported stolen.[8]  Once Jimmy arrived, Batts explained the true reason Jimmy was there.[9]  Jimmy was then "booked" into the jail, which included fingerprinting, mug shot, and "dressing out" in jail clothing.[10]  Batts personally informed the jail staff of Jimmy's situation, including the fact that Jimmy could harm himself and that Jimmy should be watched closely.[11]

Initially, Jimmy was placed in a trustee cell block, but he was eventually moved to the "juvenile cell," which was a single-person cell where Jimmy was alone.[12]  It is undisputed that Jimmy was given a blanket in his cell.

---

[2] Exhibit A, p. 16; Exhibit B.
[3] Exhibit A, p. 16.
[4] Exhibit A, p. 16.
[5] Exhibit A, pp. 5-6.
[6] Exhibit A, p. 6.
[7] Exhibit C, Excerpts of deposition of James Sons, p. 75-76.
[8] Exhibit A, p. 13.
[9] "I escorted him to one of the back offices and told him that the real reason he was there was that he was going to be held for a mental status evaluation." Exhibit A, p 13.
[10] Exhibit A, pp. 15-16.
[11] "[W]e had received information that he could harm himself," and "we needed to [] watch him closely." Exhibit A, pp. 22-23.
[12] Exhibit B.

B. *The video[13]:*

The only video surveillance preserved by Defendants is approximately an hour and fifty-three minutes of video depicting the inside of Jimmy's jail cell between the hours of 11:00 a.m. and 12:53 p.m on the morning of September 19, 2015. With reference to the video's timestamp, from 11:00:00 to 11:22:13, Jimmy is shown lying on the bottom bunk of the cell. At 11:22:13, Jimmy rose from the bunk, and he walked over to the cell door. Jimmy stood at the doorway until 11:22:48. It appears that Jimmy was placing his ear near the door to hear since he could not see out. The door was equipped with a window and a slot for food to be slid through, both of which could only be opened from the outside.[14] It should be noted that the doorway is in shadow, indicating that the window on the door was closed. Jimmy returned to and sat on the bottom bunk after standing at the door. The video shows that Jimmy had something white, likely a strip torn from his blanket, wrapped around the fingers of his right hand. At 11:23:12, Jimmy rewrapped the white strip around his fingers. Jimmy just sat on the edge of the bed until, at 11:24:29, Jimmy gently punched at the brick wall of his bunk with his wrapped right hand and air boxed for a few seconds. At 11:24:36, Jimmy sat still, staring at the stone wall and the concrete floor. Finally, Jimmy lay down again at 11:25:43, using the blanket as a pillow.

At 11:28:07, Jimmy once again walked to the door and listened. After pacing restlessly for a few seconds, Jimmy sat on the edge of the bunk again at 11:28:37. At 11:29:56, Jimmy began staring at the blanket on the bunk. At 11:30:05, Jimmy reached for the blanket, and began tying it around his neck. It is obvious that, by this point, the blanket had already been noticeably torn. At 11:30:34, Jimmy simply sat back on his bunk, hands folded in his lap, with the blanket

---

[13] It is represented in Defendants' motion for summary judgment that the surveillance video has been provided to the Court as Exhibit 1 to that motion. Plaintiff will not duplicate this exhibit, but will reference the video provided by Defendants.

[14] Exhibit D and Exhibit E, Photos of cell door from inside and outside.

tied around his neck. Jimmy sat still on his bunk with the blanket tied around his neck for 3 full minutes. While it is impossible to know exactly what Jimmy was thinking, it is certainly reasonable to infer from Jimmy's actions, repeatedly checking the cell door and sitting for an extended time with a blanket tied around his neck, that Jimmy was seeing if anyone would stop him from killing himself, as his father was able to do when he found Jimmy with a loaded shotgun in his mouth. It could reasonably be inferred that Jimmy wanted to be caught and wanted to be stopped.

At 11:33:39, Jimmy removed the blanket from his neck, and lay the obviously-torn strip of blanket across his lap, in full view of the camera. Jimmy proceeded to tear the blanket even more, stopping every couple of seconds and just sitting. At 11:34:18, Jimmy began to place the end of the torn strip of blanket through a hole in the top bunk above his head, but he pulled the blanket down and tore it more. He then pulled on the strip, seemingly testing its strength. At 11:34:39, Jimmy proceeded to tie the blanket through the hole in the top bunk. At 11:35:10, after the torn strip of blanket was secured to the top bunk, Jimmy tied the excess of the strip around his neck. At 11:35:28, Jimmy slid off the edge of his bunk and began hanging himself. At 11:37:55, Jimmy stopped moving.

Jimmy's body hung limp, lifeless, undisturbed, and presumably, unnoticed, for the next forty-eight minutes. It was not until 12:25:50 when a light shone through the door as the food tray was opened by a trustee delivering Jimmy's lunch. James Beeler was the detainee who was serving lunch, and he was the first to see that Jimmy had committed suicide, when he looked through the tray slot after Jimmy did not grab his lunch.[15] Beeler called for jailer Johnny Stanton upon discovering Jimmy's body.[16]

---

[15] Exhibit F, Excerpt of deposition of James Beeler, p. 6.
[16] Exhibit F, p. 6.

At 12:27:32, Johnny Stanton entered the cell and tugged on the blanket that was taut between Jimmy's neck and the top bunk. Detainee Donnie Richmond went into the cell at 12:28:00 and attempted to cut the blanket, but his knife was too dull.[17] James Beeler got a sharper knife and entered the room and cut the blanket at 12:28:26. Beeler held Jimmy up for a few seconds before lowering him to the floor.

At 12:30:18, two people entered Jimmy's cell and looked at Jimmy's body. It appears that one man took a knife from his pocket and cut the portion of the blanket that remained around Jimmy's neck at 12:30:45.[18] When those two people finally exited the cell, they closed the door. At 12:31:45, one can see that the window on the cell door was open for the first time in the entire duration of the video, as the light coming through the window can be seen on the door frame, just like the light coming through the food tray slot. From 11:00:00 until 12:31:45, that window was closed.

At 12:33:54, a man went into the cell and took several pictures of the cell and Jimmy's body. At 12:43:15, the door to the cell was closed, and immediately after, the window on the cell door was closed and so was the food tray slot, returning the doorway to the darkness it was in prior to Jimmy's suicide. The remainder of the video shows only Jimmy's body lying on the floor.

## II. Argument

A. *Summary Judgment Standard:*

"Summary judgment is proper only when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Payne v. Benton County*, 2012 WL

---

[17] Exhibit S, Excerpt of deposition of Donnie Richmond, p. 10.
[18] Presumably, this was Benton County Detective, Pete Samples.

5833644 (N.D. Miss. 2012)(Citing Fed.R.Civ.P. 56(a), (c)). "If the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party,' then there is a genuine dispute as to a material fact." *Id.*(Quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Qualified immunity presents a "two-pronged inquiry that requires the Court to first determine 'whether [the plaintiff] has adduced sufficient evidence to raise a genuine issue of material fact suggesting [the defendant]'s conduct[] violated an actual constitutional right.'" *Id.* at *4(Quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)). "If a violation of a constitutional right is shown by the facts, the second inquiry is 'whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.'" *Id.*(Quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)). As always, when addressing a motion for summary judgment, including under the defense of qualified immunity, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Brauner v. Coody*, 793 F.3d 493, 497(5th Cir. 2015).

B.      *Clearly established right:*

It is clear that those within the custody of the State had a right that was clearly established prior to September 19, 2015, to protection from self-harm. "It is now clear that a failure to provide adequate protection against a prisoner's known suicidal impulses is actionable." *Anderson v. Dallas County Texas*, 286 Fed.Appx. 850, 857 (5th Cir. 2008)(Citing *Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993)). "The constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996). "[A] pretrial detainee's due process rights are said to be 'at least as great as the Eighth Amendment

6

protections available to a convicted prisoner.'" *Id.*(Quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Further, the United States Supreme Court has noted that, "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982). Therefore, it should be clear that, as an involuntarily committed, non-criminal suspect within the Benton County Jail, Jimmy Parks Sons was entitled to the highest level of constitutional protection.

    C.    *The Youngberg standard:*

Defendants argue that this case should be analyzed under a "deliberate indifference" standard. However, that is not clear. As quoted above, the Supreme Court's *Youngberg* decision suggests that those who are involuntarily committed, as opposed to those suspected of or convicted of a crime, would be entitled to a standard of review not as stringent as the deliberate indifference standard. The Fifth Circuit recognized *Youngberg* in *Hare*, stating, "[t]he only Supreme Court case that arguably counsels against a deliberate indifference standard is *Youngberg v. Romeo.*" 74 F.3d at 646(Internal citation omitted). The *Hare* Court continued:

> The Court found the appropriate standard in the Due Process Clause of the Fourteenth Amendment, concluding that "liability may be imposed only when the decision by the [mental health] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person actually did not base the decision on such a judgment."

> The Court in Youngberg thus announced a distinct standard to be applied in measuring the State's constitutional duties to mental incompetents, one that differed from both the Bell test and the deliberate indifference standard. The Youngberg measure flowed from the premise that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."

*Id.* at 646-47(Quoting *Youngberg*, 457 U.S. at 321-22, 323).

However, *Hare* posits that *Youngberg*'s holding is seemingly in conflict with the reasoning of a later Supreme Court case, *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). *Id.* at 647. *Hare* states that *Youngberg*'s consideration of the status of one within state custody conflicts with *DeShaney*'s reasoning that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 639, 647(Citing *DeShaney*, 489 U.S. at 200). *DeShaney*, however, involved a person who was not within State custody at the time of the alleged due process violation. 489 U.S. at 201. *DeShaney* did not discuss what level of consideration is owed to those who find themselves within state custody. Rather, *DeShaney* only decided that the right to protection under Fourteenth Amendment due process is not triggered simply by a state actor's knowledge that a person might be in danger when that person is not in the custody of the state.

The answer to the conflict between *Youngberg* and *DeShaney*, if in fact there is even a conflict, is not clear. The *Hare* Court declined to resolve the issue, as *Hare* dealt with pretrial detainees, not involuntary commitments. 74 F.3d at 647. Certainly, *Youngberg*'s admonition that involuntarily committed persons are entitled to "more considerate treatment and conditions of confinement than criminals" should be taken into consideration. Plaintiff will analyze the facts of this case under the more stringent deliberate indifference standard, as Defendants agree that if the deliberate indifference standard is met, then Plaintiff has carried his burden to defeat summary judgment, but Plaintiff will briefly address the *Youngberg* issue as well.

D.    *McMullen and Benton County's written suicide policy:*[19]

About twenty-three years ago, A.A. McMullen became Sheriff of Benton County, Mississippi.[20]  At that time, he contacted Sheriff Riley of DeSoto County, Mississippi, and requested a copy of DeSoto County's policies.[21]  Those policies, including the suicide policy of the DeSoto County Jail, became Benton's County's official policies.[22]  Since that time, the policies have gone unchanged, as McMullen explained, if DeSoto County's policies from 23 years ago were compared to Benton County's current policies, "It should be pretty much the same."[23]

The written policy of the Benton County Sheriff's Department is obviously constitutionally deficient.  The policy makes no mention of the need for screening to determine whether an inmate or detainee might be likely to harm himself.  Even the "medical services" policy only contemplates physical medical issues, with no mention whatsoever of mental health or suicide risk screening.[24]  The suicide policy only addresses protocol to be followed after a suicide or attempted suicide *inside the jail*.[25]  McMullen admitted that his suicide policy would only be triggered if an inmate or detainee either committed suicide or attempted suicide within the jail.[26]  As it is clear that inmates, detainees, and those who are civilly committed are constitutionally entitled to protection, including protection from self-harm, while in state custody, a policy which does not even contemplate protection of suicidal persons until *after* suicide has been attempted within the jail is deficient and is itself a repudiation of that

---

[19] It is undisputed that Sheriff A.A. McMullen is the chief policymaker for the Benton County Jail.
[20] Exhibit G, Excerpts from the deposition of A.A. McMullen, pp. 29-30.
[21] Exhibit G, pp. 29-30.
[22] It is clear from looking at the written suicide policy that "DeSoto County" was whited out and "Benton County Sheriff's Dept." was simply typed into an already existing document. Exhibit H, Suicide policy of Benton County Jail.
[23] Exhibit G, p. 30.
[24] Exhibit I, Medical services policy of Benton County Jail.
[25] The policy begins, "In the event of a suspected suicide or attempted suicide . . ." Exhibit H.
[26] Exhibit G, pp. 64-65.

constitutional right to protection. As such, this policy triggers liability for McMullen and for Benton County. See *Cozzo v. Tangipahoa Parish Council--President Government*, 279 F.3d 273, 289 (5th Cir. 2002)(Supervisory liability may additionally exist without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.)(Internal citations omitted).

E.      *Whether there is an unwritten policy:*

Chief Deputy Joe Batts attempted in his deposition to cure the deficiency of McMullen's written policy by describing an unwritten policy of "lunacy watch." The gist of "lunacy watch," according to Batts, is that all civil mental commitments within the Benton County Jail are to be checked on visually every 15 minutes.[27] According to Batts, while Jimmy would not have technically been on suicide watch under Benton County's written policy, Jimmy was on "lunacy watch," which is "the same as suicide."[28]

Complicating Batts' contention that there is a policy under which mental commitments are to be visually checked every 15 minutes is the testimony of the jail's chief policymaker himself. McMullen testified that Jimmy was "treated like all other mental cases that [Benton County] bring[s] in," as he was "placed in a cell and he was watched."[29] McMullen continued, "and like I told you, I can't watch it 24 hours, you know. I just don't have the manpower to do it." McMullen was then asked, "How often would you expect or do you require that your jailer or dispatcher watch a mental commitment?" McMullen replied, "*It's not required*. You know, I expect them to watch it as much as possible, but they just can't watch it all the time."[30]

---

[27] Exhibit A, pp. 48-50.
[28] Exhibit A, p. 49.
[29] Exhibit G, p. 57.
[30] Exhibit G, pp. 57-58(Emphasis added).

McMullen admitted that there is no requirement for monitoring mental commitments, and thus, there is no policy for monitoring potentially suicidal persons who have not actually attempted suicide within the jail.[31]  McMullen's insistence that he does not have "the manpower" to watch the video "all the time" indicates an intentional choice *not* to promulgate a policy requiring more stringent observation of mental commitments in the jail.  Failure to promulgate a policy may serve as the basis for §1983 liability where it is an intentional choice, and the likely result is a constitutional violation. See *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir. 1993).  An inadequate written policy coupled with a non-existent unwritten policy shows that suicidal persons in the custody of the Benton County Jail were guaranteed no increased level of protection from self-harm unless they were lucky enough to survive their first suicide attempt within the jail.

      F.    *Johnny Stanton:*

         *1.  Stanton's knowledge of Jimmy's risk of suicide:*

Johnny Stanton has been a jailer with the Benton County Jail since May, 2005.[32]  Stanton was the jailer on duty on September 18, 2015, who booked Jimmy into the Benton County Jail, and he was the jailer on duty on September 19, 2015, when Jimmy committed suicide.  While Stanton denies being told that Jimmy was a danger to himself,[33] Joe Batts testified that he personally told other members of the sheriff's department, including Johnny Stanton, that Jimmy was "a mental commitment," on whom he "had received information that he could harm himself," and that the jailers should "watch him closely."[34]  Batts had no doubt that the information about Jimmy was conveyed to the Benton County officials in charge of watching

---

[31] Exhibit G, pp. 51-52.  According to McMullen there is no policy or procedure creating a heightened monitoring standard for mental commitments.
[32] Exhibit J, Excerpts from the deposition of Johnny Stanton, p. 5.
[33] Exhibit J, p. 7, 32.  "[Batts] said to watch him.  He didn't indicate anything else, just watch him." Exhibit J, p. 29.
[34] Exhibit A, pp. 22-23, 45.

Jimmy.[35]  It is undisputed that Stanton was the jailer on duty when Jimmy was booked and that Joe Batts spoke to him directly about Jimmy at the time of Jimmy's booking.[36]  Viewing the evidence in the light most favorable to Plaintiff, Stanton had subjective knowledge that Jimmy was a danger to himself.

> 2. *Stanton's actions:*

Defendants argue that Stanton followed the jail's policy of "continuously monitoring" Jimmy by video surveillance.  The term "continuously monitored," as used by Defendants, is misleading.  While there was a camera in Jimmy's cell, there was no policy for how often the feed was to be checked, and the circumstances make clear that he was hardly "continuously monitored."  Stanton's own testimony sheds no light on how often Jimmy was being checked on. On one hand, Stanton states that Jimmy was being watched continuously, and then in nearly the same breath, he states that it would have been impossible to watch Jimmy continuously.[37] Stanton's testimony also shines more light on the gaping hole where an adequate suicide watch policy should be.  In contrast to Batts' testimony that lunacy watch and suicide watch were the same thing, Stanton, who had been a jailer with Benton County for ten and a half years at the time of Jimmy's suicide, testified that he had never heard of a "lunacy watch" but that a "lunacy watch" and a suicide watch would be "completely different things."[38]

Stanton had no explanation for how *he* was conducting *his* version of a "lunacy watch" other than more equivocating.  When asked whose responsibility it was to watch Jimmy while Jimmy was preparing to commit suicide, Stanton stated, "It would have been the dispatcher and

---

[35] Exhibit A, p. 23.
[36] Exhibit J, pp. 28-29.
[37] Exhibit J, pp. 8-9.  Stanton states, "Eyes are on him at all times," and then goes on to state "if I had to say that somebody is on him all the time, no, I can't say that," and finally goes on to say again, "But you got eyes on him all the time."  This is on one page of testimony.
[38] Exhibit J, p. 48.

myself. But, now, we don't keep our eyes on that camera every minute. We've got phones ringing, we've got everything else."[39] Then, asked the simple question of how long it had been since he had put his eyes on the camera, Stanton stated, "They stay on it continuously. Before we started serving lunch they stay on it continuously. But I'm also answering phones and different things at all times."[40] Stanton's official answer seems to be "I watched him all the time, but I couldn't watch him all the time," and as a result, no one knows when or if Stanton was ever checking in on Jimmy.

What is undisputed is that there is a video camera which shows Johnny Stanton's desk, and another video camera which shows the hallway outside Jimmy's cell. If that video had been preserved, and it was not, we would be able to see exactly when Stanton was at his desk watching the monitor, and we would be able to see exactly when Stanton was walking the hallway and whether he checked on Jimmy in his cell. Joe Batts testified that video would have shown whether Johnny Stanton was absent from his post and not monitoring Jimmy,[41] and McMullen testified that the video from other parts of the jail would have been important to view what was going on outside as well as inside the cell.[42] Despite the importance of this video, as recognized by the chief policymaker and his chief deputy, not only was the video not pulled and preserved for this litigation, it was not even pulled and viewed by the sheriff or the chief deputy.[43] As a result, we are left only with Stanton's word that he monitored Jimmy. Thankfully, the video from inside the cell is sufficient to reveal at least some of Stanton's

---

[39] Exhibit J, p. 26.
[40] Exhibit J, pp. 26-27.
[41] Exhibit A, p. 53.
[42] Exhibit G, pp. 38-39.
[43] Despite the admission of the importance of the video and the fact that a "notice and request for litigation hold" letter was sent to McMullen on September 22, 2015, the video was not preserved. Exhibit L, Spoliation letter. "[A]n inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Whitt v. Stephens County*, 529 F.3d 278, 285 (5th Cir. 2008)(Internal citation omitted).

falsehoods.

Stanton testified that he walked by Jimmy's cell at 12:00 p.m., give or take 15 to 20 minutes.[44] Stanton testified that the window on Jimmy's cell door was open and he was able to see Jimmy standing up when he walked by.[45] According to Stanton, the window on the cell door remained open, and was even open at the time Jimmy committed suicide, so that someone in the hall would have been able to see into the cell.[46] Stanton's written statement, which was written on September 19, 2015, states that he walked by Jimmy's cell to get Donnie Richmond and James Beeler, who were outside washing a truck, at 12:10 p.m., and it further states that Jimmy was standing at his cell door at that time.[47]

Obviously, Stanton is not being truthful. We know from the video that the last time Jimmy was standing at the door of his cell was 11:28:07 and at 12:10, when Stanton allegedly saw him, Jimmy had already been hanging from his top bunk for more than 30 minutes. While defense counsel attempts to cure the inconsistency by saying the times are approximate, it is hard to imagine that Stanton would have been off in his estimate by 42 minutes on the day of the event. Further, we know that Stanton is simply lying about the window on Jimmy's cell door being open. Between 11:00 and 12:25:50, the video shows a completely darkened doorway to Jimmy's cell. It is clear that light could be seen through the door when the food tray hole was opened and when the window was finally opened at 12:31:35, long after Jimmy had committed suicide. Stanton's testimony that he saw Jimmy standing in his cell is false.

This Court dealt with a similar set of facts in *Speck v. DeSoto County, Mississippi*, 2012 WL 2685060 (N.D. Miss. 2012). There, a jailer, Jane Thompson, booked an inmate, Cayce

---

[44] Exhibit J, p. 12.
[45] Exhibit J, pp. 14-15.
[46] Exhibit J, pp. 16-19.
[47] Exhibit K, Statement of Johnny Stanton.

14

Allen, and was told that Allen might have suicidal tendencies. *Speck*, 2012 WL 2685060 at *1-2. Just as Stanton was "constantly watching" Jimmy, Thompson alleged she "maintained a constant vigil on Allen." *Id.* at *2. In denying qualified immunity to Thompson, this Court stated:

> In arguing that her actions did not demonstrate deliberate indifference, Thompson testified that she kept a constant vigil on Allen and instructed other officers to watch her. Thompson alleges that she observed Allen for approximately two hours, interviewed her regarding suicidal tendencies, and never heard direct threats from Allen. However, no documentation exists to show whether or how frequently any officers checked on Allen. Moreover, Allen was left unsupervised long enough to construct the noose with which she committed suicide. A reasonable jury, viewing these facts in the light most favorable to the plaintiffs, could determine that Thompson acted with deliberate indifference to Allen's substantial risk of suicide.

*Id.* at *6.

Stanton kept no documentation of how or when he monitored Jimmy, and there was no video preserved to show Stanton's actions or whereabouts throughout the day. It is clear that he did not feel there was a need for Jimmy to be checked often, as he never testified that Jimmy was checked on a regular schedule. Stanton's only testimony is the Defendants' party line that Jimmy was "continuously monitored." That is obviously not true, as nearly an hour passed between Jimmy constructing his noose and the time his body was discovered. A reasonable juror could conclude that Stanton was not monitoring Jimmy at all. Stanton's obvious, self-serving falsehoods only make this more likely the truth. In the light most favorable to Plaintiff, the facts are that Batts told Stanton of Jimmy's suicidal tendencies, and Stanton acted with deliberate indifference to that suicide risk by not monitoring Jimmy for his own protection.

### 3. *Missy Campbell:*

It is undisputed that at the time of Jimmy's suicide, Stanton, as the jailer on duty, was the Benton County official responsible for monitoring Jimmy. However, the Defendants seemingly argue that if there is anyone to blame for Jimmy's death, it would be Missy Campbell, the

dispatcher who was on duty at the time of Jimmy's suicide. The Defendants state that while Stanton was away from his desk, "the responsibility of monitoring Sons was left to dispatcher, Missy Campbell, who failed to alert Jailor Stanton to Sons' actions."[48]

There is no mystery to why the Defense would seek to lay blame on Campbell, as she is now deceased and is not a defendant in this cause. However, while Johnny Stanton was the jailer who actually booked Jimmy into the jail and who had a conversation with Joe Batts about Jimmy's situation, Missy Campbell was not the dispatcher on duty at that time.[49] When asked whose responsibility it would have been to convey information about inmates to others in the jail, Joe Batts explained that it would have been the responsibility of the jailer on duty:

Q.      You earlier said that you had informed the jail about his condition and that he needed to be monitored closely. Can I assume that Johnny Stanton as well as all the other jailers would have received that information?

A.      Yes.

Q.      And since you, I assume, would not have been present to deliver that information to some of the other jailers on different shifts, how would that information have been passed along to them?

A.      It's done during the transition between the jailers.

Q.      So the policy is when you tell, for example, Mr. Stanton, then it's Mr. Stanton's job when he goes off duty to pass that information along to the next person coming on duty?

A.      That's correct.

Q.      And the same with the dispatcher?

A.      Yes.

Q.      So that you are assured that every staff member responsible for running the jail would have received that information, which you originally communicated to your jail staff?

A.      Yes.[50]

---

[48] Doc. 56, p. 2.
[49] Exhibit A, p. 45.
[50] Exhibit A, p. 45.

It stands to reason, that if Stanton, as the person primarily responsible for monitoring Jimmy, were to leave his post, he should have informed Missy Campbell not only that he was leaving, but also of the particular need for monitoring Jimmy due to his proclivity for self-harm. There is absolutely no evidence that Stanton did this. Further, it is clear that Missy Campbell did not even know the identity of the person in the juvenile cell, much less the need for watching him closely. There is audio of the call, after the discovery of Jimmy's body, from Missy Campbell to Sheriff McMullen, which can be partially transcribed as follows:

Missy Campbell (MC): Sheriff, we got an inmate that's committed suicide.

Sheriff McMullen (SM): You got to be kidding.

MC: Hung himself in the juvenile cell. He's gone. Bobby brought him in last night. Tracy Mixon.

SM: Yeah, who?

MC: Tracy Mixon. He just sat down on the floor.[51]

The audio makes clear that Missy Campbell believed there was an inmate, who was presumably arrested by a deputy named Bobby on the night of September 18, 2015, in the juvenile cell. Therefore, it is only reasonable to conclude that she had not been informed, by Stanton or anyone else, that Jimmy Parks Sons, a civil mental commitment who might be suicidal, was in fact in the juvenile cell and that he should have been closely monitored. The Defense's blaming of Missy Campbell is a half-hearted attempt to place some blame on a Benton County official without actually accepting any liability. However, the facts make clear, liability still lies with Stanton and Benton County.

A jury could easily find from the circumstances that Stanton was not monitoring Jimmy and that Stanton did nothing to insure that Missy Campbell was monitoring Jimmy in his

---

[51] Exhibit M, Dispatch audio call from Missy Campbell to Sheriff McMullen, filed conventionally.

absence.  No reasonable officer could believe placing a suicidal inmate in an isolated cell with a blanket and then not monitoring them for extended lengths of time to be reasonable.  Stanton's actions are clearly unreasonable in light of Jimmy's clearly established right to protection from self-harm.   Stanton is not entitled to qualified immunity, and the summary judgment motion as to Stanton should be denied.

      G:      *Joe Batts:*

There can be no doubt that Batts had actual knowledge of Jimmy's suicidal tendencies. He was informed by Jimmy's father that Jimmy had been found with a shotgun in his mouth. Batts was in fact the person who recommended to Jimmy's father that he have Jimmy civilly committed through the chancery court so that the jail could keep him safe until such time as Jimmy could be transferred to a mental health facility.[52]  Batts never denies knowledge that Jimmy was suicidal.  In fact, he testified that he "told other members of the sheriff's department, you know, that, you know, he was a mental commitment, that we had received information that he could harm himself, you know, and that we needed to, you know, watch him closely."[53]

Ostensibly, at least according to his own testimony, Batts acted fairly reasonably.  In fact, according to a recent Fifth Circuit case, Batts, under his own version of the events, might be entitled to summary judgment. See *Hyatt v. Thomas*, 843 F.3d 172, 180 (5th Cir. 2016)(holding officer not deliberately indifferent to suicidal inmate's rights where she withheld most obvious potential ligature, placed him under video surveillance, and directed relieving officer to keep close watch).  However, as the material facts here are genuinely disputed, summary judgment cannot be granted for Batts, and a jury must decide which facts are true.

---

[52] Batts testified the whole purpose of Jimmy being in the jail was to protect him. Exhibit A, p. 10.
[53] Exhibit A, pp. 22-23.

Stanton testified that Batts did not inform him of Jimmy's possible suicidal tendencies.[54] Presumably, in an effort to avoid liability, Stanton will tell the jury that he was not informed by Batts of Jimmy's suicidal nature. A jury could find this testimony to be true, and as such, a jury could find that Batts, as the Benton County official with the most intimate and detailed knowledge of Jimmy's circumstances acted with deliberate in difference to Jimmy's rights by not informing the jailer on duty, Stanton, of Jimmy's suicidal nature, information that certainly should have been passed along to Stanton. The Court cannot at this stage weigh the credibility of these witnesses, whose stories are inconsistent. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The Court at the summary judgment stage can only recognize that there are factual versions upon which Stanton and Batts could each be held liable by a jury. Therefore, because of the disputed facts within the testimony of the defendants, summary judgment is inappropriate. Further, it cannot be discounted that Batts is the person at whose urging Plaintiff entrusted his son's life to the Benton County Jail.

H.    *A.A. McMullen:*

A sheriff may be held liable for failure to train or supervise his officers where a causal connection exists between the failure to train or supervise and the violation of the plaintiff's constitutional rights and the sheriff's failure constituted deliberate indifference to the plaintiff's rights. See, *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 459 (5th Cir. 2001). Generally, a plaintiff must prove a pattern of similar violations, and the inadequacy of the training or

---

[54] When asked whether he was told that Jimmy was at the jail because he may harm himself, Stanton stated, "No. No. All I was told that he had problems and to watch him. He was not put on suicide watch." Exhibit J, p. 7.

19

supervision must be obvious and likely to result in a constitutional violation. *Id.* However, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which the County may be liable." *Brown v. Bryan County, OK*, 219 F.3d 450, 462 (5th Cir. 2000). "[This 'single incident exception' is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010)(Internal citations omitted). "[A] plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Valle*, 613 F.3d at 549.

It is undisputed that the only reason Jimmy was in the Benton County Jail was for his own protection until such time as he could be transferred to a mental health facility. McMullen volunteered at his deposition that "any mental commitment is a suicide risk."[55] If the chief policymaker for Benton County's jail understands that to be true, then he should put policies in place and train his officers to protect mental commitments within his jail. However, he has done neither. McMullen recognized that the only suicide policy within the jail would not be triggered unless a detainee actually attempted suicide within the jail.[56] When asked how often he would expect or require his jailer or dispatcher to watch a mental commitment, McMullen responded, "It's not required. You know, I expect them to watch it as much as possible, but they just can't watch it all the time."[57]

What is arguably more troubling than McMullen's inadequate policies and his failure to train his officers is the fact that McMullen had personal knowledge of Jimmy's circumstances prior to Jimmy's suicide and was not truthful about that fact at his deposition. The pertinent testimony is as follows:

---

[55] Exhibit G, p. 55.
[56] Exhibit G, pp. 64-65.
[57] Exhibit G, pp. 57-58.

Q.      As we sit here today do you know why [Jimmy] had been brought to the jail?

A.      Yes. I know now why he had been brought in.

Q.      Why?

A.      His father wanted him locked up.

Q.      Why did his father want him locked up?

A.      He was afraid of him. Now, this is what I – now, I didn't talk to Mr. Sons beforehand. This is just what I – I talked to him afterwards.

Q.      You never talked to Mr. Sons prior to his son killing himself?

A.      No.

Q.      Is it a fair statement to say, Sheriff McMullen, that prior to Mr. Sons committing suicide you had not heard about Mr. Sons or what Mr. Sons, the father, had said as to why he was committing his son to the jail?

McMullen's answer to this is evasive:

A.      I never talked to Mr. Sons until after it was over with. That morning after it was over with I came into the office as soon as I found it out and I met with Mr. Sons and I think it was his wife I met with up there in the office.

Q.      So the first time you even knew anything about why Mr. Sons had brought in his son Jimmy and committed him to the jail was after the suicide occurred?

A.      Yes.

Q.      You're sure about that?

A.      I wasn't there that week. I know I didn't see him.

Q.      I'm not asking whether you saw him. I'm asking you whether you knew anything about why he committed him to the Benton County jail prior to committing suicide?

A.      Not that I know of. Unh-unh (Indicating no). I talked with Mr. Sons and all of this come up afterwards.

Q.      So is it a fair statement to say that prior to – do I understand your testimony correctly that prior to Mr. Sons committing suicide you didn't have any reason to believe he was a suicide risk?

A.      Unh-unh (Indicating no).

McMullen went on to reiterate that he "never met Mr. Sons" and that he never knew of anything prior to the suicide that would have made him believe that Mr. Sons was a suicide risk.[58]

Shortly after Missy Campbell called McMullen and mistakenly informed him that Tracy Mixon had committed suicide, McMullen called her back while he was still on his way to the jail to clarify.  That call went, in part, as follows:

MC:    Sheriff's office.

SM:    Yeah, when I was up there last night that Parks-Sons boy was in the juvenile cell.

MC:    That's him.  That's who it is, Sheriff.  That's who it is.  You remember that boy coming in here saying his gun was stole the other day?

SM:    Yeah.

MC:    That's him.

SM:    Ok. I was fixing to say there wasn't no Mixon in there when I left there about 10:00 last night.

MC:    No.  It's that Parks-Sons boy.  The one that come in here the other day saying his gun was stolen from over at Dollar General.

SM:    Ok.

MC:    You remember him? Were you here when he done that?

SM:    No, I wasn't there that day, but I know his daddy said the other day he went in on him at his house and he had a shotgun stuck in his mouth.[59]

This conversation exposes several things.  First, McMullen was in fact present at the jail until around 10:00 p.m. on September 18, 2015, and he knew that Jimmy was in the juvenile cell. Further, McMullen knew that Jimmy had been found by his father with a shotgun in his mouth. Finally, either McMullen had forgotten these facts by the time of his December 7, 2016,

---

[58] Exhibit G, pp. 44-46.
[59] Exhibit N, Sheriff's call to dispatch, filed conventionally.

deposition, or he was being purposefully untruthful about his presence at the jail and his personal knowledge of Jimmy's circumstances. Either way, it is clear that McMullen had the personal opportunity to take steps to protect Jimmy, and he chose not to do so.

It is undisputed, and obvious now, that Jimmy had a blanket in the juvenile cell with him. This should have been of concern to McMullen as during his tenure as Sheriff of Benton County, at least two inmates have committed suicide by hanging themselves with torn blankets or sheets.[60] While these prior suicides might not be enough to establish a pattern, at the very least, these suicides and their preventable nature should have been in McMullen's mind. Yet, there is no indication he took any steps to remedy this situation, nor did Sheriff McMullen make any changes to the policies he copied from DeSoto County 23 years ago. Obviously, removing potential ligatures would be a simple and effective step toward protecting potentially suicidal detainees. Further, William Brown, the jailer who worked a shift from 2:00 p.m. until 10:00 p.m. on September 18, 2015, testified that he kept the window on Jimmy's cell door closed because, "we got traffic in and out and we didn't want him conversating with other people and didn't want peoples conversating with him."[61] Since Brown's shift ended at 10:00 p.m., the time that McMullen said he left the jail, McMullen should have noticed that the window to the cell was being left shut. He certainly could have instructed Brown to leave the window open so that Jimmy would be more readily observable. Finally, McMullen did not even institute a suicide watch for Jimmy which would have required him to be checked on at least every 15 minutes. Any one of these simple actions, particularly removing a known ligature risk from the cell, could have prevented Jimmy's suicide.

---

[60] Exhibit G, pp. 10-12. There were hanging deaths in the early 2000s and in 1989. There was another hanging death in 2008 in the jail, but that inmate, Mr. Thompson, used a strip of towel, not a sheet.
[61] Exhibit O, p. 17.

Because of the evidence from McMullen's own mouth, we know that McMullen knew of Jimmy's suicidal tendencies. Because he was present at the jail on the night of September 18, 2015, we know he was in a position to take steps to protect Jimmy. Tragically, we know he took no steps to protect Jimmy, and instead, exhibited deliberate indifference to Jimmy's right to protection from self-harm.

One of the more bewildering revelations from McMullen's deposition is that he still had not watched the video from inside the cell as of the date of his deposition, nor had he watched any other video from inside the jail to gather facts on what had happened. When asked how it was possible that no one with the jail intervened in Jimmy's suicide, McMullen responded, "I don't know. I don't know what – that's what I say. I wasn't there and I've not seen the video on it."[62]

Jimmy Parks Sons was a troubled young man whose entire purpose for being at the Benton County Jail was for his own protection from himself. He was placed in a cell alone. The only window to the cell was kept closed. There is no evidence that he was being routinely or regularly monitored, and there was no policy in place requiring routine or regular monitoring of Jimmy as a potentially suicidal mental commitment. In fact, the only evidence that is absolutely clear, the video of Jimmy's cell, shows that Jimmy was not being monitored. The cell had no television, and Jimmy did not even have any reading material.[63] What Jimmy did have in the cell was a blanket. It could be argued that it is universal knowledge that blankets can be torn and used in hanging suicides, particularly within the jail setting. Even if that is not "universal knowledge," it should certainly be within the knowledge of McMullen and the staff of the Benton County Jail, where at least two hanging suicides involving blankets have occurred. Was

---

[62] Exhibit G, pp. 40-41.
[63] Exhibit J, p. 41.

it highly predictable that a suicidal person locked in solitary confinement, with no outside human contact, with no regular monitoring, with nothing to occupy his mind except his thoughts, and with possibly the most obvious material for a makeshift noose, would attempt to commit suicide?[64] The answer is obviously, "yes."

Defendants attempt to rely upon the Supreme Court case *Taylor v. Barkes*, 135 S.Ct. 2042, 192 L.Ed.2d 78, 83 USLW 3875 (2015), to free McMullen and Benton County of liability. Defendants' use of *Taylor* in this context is a red herring. *Taylor* involved the question of whether the Eighth Amendment required state institutions to screen inmates for latent suicidal tendencies. 135 S.Ct. at 2044-45. The Court ultimately concluded that a complete psychological screening was not included within the Eighth Amendment's guarantee of adequate medical care. *Id.* at 2045. This was already established in the Fifth Circuit in the case of *Burns v. Galveston*, 905 F.2d 100, 104 (5th Cir. 1990). Also, it has nothing to do with the issues of this case. It is absolutely clear that policymakers and the counties they make policy for may be held liable for failing to protect those in their custody from *known* suicidal tendencies, and all the evidence in this case establishes that Jimmy's suicidal tendencies were *known*, particularly considering that was the entire reason he was in the Benton County Jail. Further, *Taylor*'s analysis was under the Eighth Amendment concerning a convicted inmate, which does not take into account the additional consideration to which an involuntarily committed person is entitled under *Youngberg*. *Taylor* provides no protection to McMullen and Benton County.

Defendants further argue that Jimmy's suicide "took only six to seven (6-7) minutes" and so a "policy requiring face to face, periodic checks would have made no difference in this

---

[64] Arguably, Jimmy's conditions amounted to punishment, which would be impermissible under our Constitution, since he was convicted of no crime. Everyone knows that solitary confinement is used as an extreme and effective punishment in prison. Recognizing there is arguably some interest in isolating and observing the mentally ill, Jimmy's conditions, especially considering he never once exhibited a behavioral issue within the jail, were extreme.

case."[65]  First, this argument is inappropriate for summary judgment, as in order to give it credence, this Court would necessarily have to grant an impermissible inference to the summary judgment movants, namely that Jimmy committed suicide *between checks*.  There is no evidence to support this argument, and the Court cannot give that inference to the Defense.  This argument also ignores the other glaring problems with McMullen and Benton County, such as Jimmy being given a blanket, a known implement in jail suicides, in solitary confinement conditions. This Court has recognized the importance of removing potentially hazardous items from a jail cell:

> The court regards as particularly troubling the fact Allen was placed in a holding cell with the personal possessions she used to commit suicide. In the court's view, simply removing personal items which could potentially be used to commit suicide would have been a simple step, and it is very hesitant to state that the Fourteenth Amendment does not require that this rather minimal step be taken in response to specific information regarding a serious and credible threat to the detainee's life. This is particularly true when considering the fact that the holding cell where Allen was kept lacked an observation camera, and the large venetian blinds were closed from the outside where Thompson was stationed.

*Speck v. DeSoto County*, 2012 WL 2685060 at *5 (N.D. Miss. 2012).  While Jimmy's cell did have a camera, it seems almost obvious now that no one was watching the monitor.  And just as the blinds in *Speck* were closed, the window to Jimmy's cell was kept closed from the outside.

Defendants' "6-7" minute argument also ignores the fact that Jimmy had already begun tearing his blanket prior to the 11:00 start time of the video preserved by Defendants.[66]  At 11:30:05 on the video, one can clearly see that the tearing of the blanket had already begun.  Had some Benton County official seen Jimmy tearing the blanket, or had someone checked in on him and looked at his blanket, this should have been a huge red flag to take the blanket and watch

---

[65] Doc. 56, p. 16.
[66] Obviously, there would be video of Jimmy tearing his blanket prior to 11:00 a.m.  However, since Defendants chose to preserve only a portion of the video relevant to this incident, Plaintiff and the Court can only assume that the tearing would have been as obvious to one watching the video feed as Jimmy's actions after 11:30:05.

Jimmy more closely. The fact that no one did notice the torn blanket is just further evidence of the failure to monitor Jimmy, and the solitariness of his confinement. The post-mortem photos of Jimmy show him lying on two food containers, one for his dinner on September 18, and one for his breakfast on September 19.[67] No one had been by to even so much as take away Jimmy's empty food trays as of lunch on September 19. In fact, no one could state when the last time Jimmy had actual human contact with another person was.[68] There is a policy of not allowing contact between inmates in the jail.[69] The windows on cell doors seem to be kept closed or covered at all times.[70] It is clear that Jimmy was treated like an inmate, not like a civil commitment.

Finally, all of the Defense arguments ignore McMullen's personal knowledge of Jimmy's circumstances, probably because McMullen himself denied that knowledge. Regardless, the dispatch audio makes clear that McMullen knew of Jimmy's circumstances, that he was present at the jail on the night of September 18, 2015, and that he acted with deliberate indifference to Jimmy's rights by taking no steps to protect Jimmy. McMullen is liable individually, and he and Benton County are each liable for his actions as the official policymaker of the Benton County Jail.

I.    *Youngberg*:[71]

The Fifth Circuit's *Hare* case, and the Supreme Court's *Youngberg* case seemingly create a legal gray area into which this case falls. While in this context, the *Youngberg* standard might not be clear, what *is* clear is that deliberate indifference would be the more stringent standard. If

---

[67] Exhibit P, Photo of Jimmy Parks Sons.
[68] Exhibit A, p. 55; Exhibit J, pp. 40-41; Exhibit O, p. 10.
[69] Exhibit Q, Johnny Stanton's note on cell door.
[70] Exhibit R, Photos of cell doors.
[71] This section may be largely academic, but this writer would be remiss in not at least briefly discussing how *Youngberg* might affect this case.

Plaintiff meets the deliberate indifference standard, and as expressed in the preceding pages, Plaintiff certainly believes he has met that standard, then Plaintiff's claims survive Defendants' summary judgment motion. However, even if the deliberate indifference standard were not met, Plaintiff's claims could still survive summary judgment. The learned Judge Dennis of the Fifth Circuit Court of Appeals recommended in his special concurrence in *Hare* that the Court had erred by applying the Eighth Amendment's deliberate indifference standard to pretrial detainees. *Hare*, 74 F.3d at 650-52, *Dennis, C.J., Specially concurring*. He recommended that the more appropriate standard for detainees would be a civil recklessness or gross negligence standard, while also taking into account "relevant legitimate governmental objectives." *Id.* at 653.

A reading of *Hare* evinces a majority yearning to "simplify" this area of law by applying one standard to all similarly situated claims. Maybe the *Hare* Court did err, as suggested by Judge Dennis, in applying the same standard to the presumed innocent as is applied to the convicted criminal. But, Jimmy Parks Sons was neither convicted of nor accused of a crime. It only makes sense that he would be entitled to more consideration, certainly than a convicted criminal, arguably more than an accused criminal suspect. *Hare* left this question open. It should certainly be taken into account by this Court. Certainly, Plaintiff has more than met his burden for surviving summary judgment under a recklessness or gross negligence standard.

Perhaps the biggest difference between a deliberate indifference standard and a recklessness or gross negligence standard is the requirement of actual knowledge of risk under the deliberate indifference standard, as opposed to a "knew *or should have known*" requirement under recklessness or gross negligence. There is ample evidence that the individual defendants all had actual knowledge of Jimmy's risk for suicide. Again, that is why he was there. While the discussion of the *Youngberg* standard is interesting from an academic standpoint, it need not

apply for Plaintiff to prevail on summary judgment.

      J.       *The systemic, prevalent indifference to suicides within the Benton County Jail:*

While this case is about what happened before and during Jimmy's suicide, what has happened since that suicide, or more accurately, what has *not* happened, is very revealing. It is, frankly, mind-boggling that McMullen did *absolutely nothing* to get to the bottom of how this happened within his jail. As discussed above, McMullen watched no video from inside the jail, including the video of Jimmy's suicide.[72] He did not listen to the dispatch audio.[73] When asked whether review of these items would be important to him, he responded, "When something like this happens I just turn it over to MBI," but then he admitted that he did not even review the MBI report.[74] McMullen made absolutely clear that he had "not talked to [MBI]" or "looked at their report" and that he had conducted no personal or independent investigation whatsoever into Jimmy's suicide.[75] McMullen's response when asked whether he could learn from incidents like this is perhaps the most revealing answer of all as to what is wrong within the Benton County Jail:

> You could write up the biggest policy in the world and you couldn't prevent it. There's no way. God knows, you know, it hurts us. But we – you know, you just – you know yourself *there ain't no way to prevent it. If they're going to do it they're going to do it*.[76]

It is painfully obvious that there were simple and humane steps that could have been taken to prevent Jimmy's suicide, and the chief policymaker's "why bother?" attitude is an indicator of the systemic indifference to the risk of suicide within the jail. What is also indicated is that the indifference runs downhill.

Joe Batts also testified that Jimmy's death could not have been prevented, and he

---

[72] Exhibit G, p. 6.
[73] Exhibit G, p. 7.
[74] Exhibit G, p. 7.
[75] Exhibit G, pp. 7-8.
[76] Exhibit G, p. 62.

indicated that he thought the jail's policies and procedures were adequate and that the jail staff were doing their jobs correctly.[77] Johnny Stanton made clear that he was not going to "second guess" himself and that he did his job "to the best of his ability."[78] It is curious that without an independent investigation, and without having even read the MBI investigative report, Sheriff McMullen and his employees can be so confident that their policies are adequate and that they acted in an objectively reasonable manner. Certainly, the Constitution demands more from policymaking officials than blissful ignorance of the events within their institutions, particularly in response to a preventable death that occurred within that institution.

## III.    Conclusion

The Fifth Circuit has recognized that "America faces an epidemic of suicide by individuals in custody" and "[y]et preventing detainee suicides is far from impossible." *Hyatt v. Thomas*, 843 F.3d 172, 180 (5th Cir. 2016). Basically, reasonable measures should be taken to prevent suicides. Here, a known suicidal person, whose only purpose for being in the jail was to protect him from himself, was placed in solitary confinement with an obvious implement of suicide. Despite there being a camera in his cell, he was not regularly monitored. The best argument the Defense can muster is that the dispatcher "simply missed it,"[79] but the dispatch audio shows clearly that she was not even informed of who was in the juvenile cell, much less of his risk for suicide. The defendants pass the buck back and forth in their testimony, but it is clear that the fault runs from top to bottom. Every defendant should remain in this case and stand trial for a jury to determine their culpability for the death of Jimmy Parks Sons.

Wherefore, premises considered, Plaintiff respectfully requests this Court deny the Defendants' motion for summary judgment.

---

[77] Exhibit A, p. 41.
[78] Exhibit J, pp. 41-42.
[79] Doc. 56, p. 16.

Respectfully submitted,


/s/ Brandon Flechas
Brandon Flechas (MS Bar No. 102283)
Philip A. Stroud (MS Bar No. 99401)
THE STROUD LAW FIRM, P.C.
5779 Getwell Road, Suite C-1
Southaven, MS 38672
Telephone: (662) 536-5656
Facsimile:  (662) 536-5657
brandon@stroudlawyers.com
philip@stroudlawyers.com
ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 16th day of June, 2017, I electronically filed the foregoing document with the Clerk of Court using the ECF system, which sent electronic notification of this filing to the following attorneys for Defendant:

S. Ray Hill, III
Clayton O'Donnell, PLLC
1300 Access Road, Suite 200
P.O. Box 676
Oxford, Mississippi 38655
rhill@claytonodonnell.com

Attorney for Defendants

I also certify that on the same date I served the foregoing document via first-class U.S. Mail on the following non-ECF participants:  None.

/s/ Brandon Flechas
Certifying attorney
